658 F.2d 39
 8 Bankr.Ct.Dec. 236
 In the Matter of NATIONAL HOSPITAL AND INSTITUTIONAL
BUILDERS COMPANY, a Partnership, Debtor.
NATIONAL HOSPITAL & INSTITUTIONAL BUILDERS CO., Plaintiff,
James L. Garrity, Trustee of the Debtor, Appellant,
v.
Philip GOLDSTEIN, New York City Dept. of Buildings, and New
York City Board of Standards & Appeals,
Defendants-Appellees.
 No. 1301, Docket 81-5009.
 United States Court of Appeals,
Second Circuit.
 Argued April 29, 1981.
Decided Aug. 17, 1981.
 
 Arthur S. Olick, New York City (Anderson, Russell, Kill & Olick, P.C., James P. Heffernan, Tina L. Wellner, New York City, of counsel), for appellant.
 Judah Dick, Asst. Corp. Counsel, New York City (Allen G. Schwartz, Corp. Counsel, Leonard Koerner, Joseph I. Lauer, Marvin B. Mitzner, New York City, of counsel), for defendants-appellees.
 Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 James L. Garrity, acting as trustee for the National Hospital and Institutional Builders Company (Debtor), appeals from an order of Judge Leval of the Southern District reversing an order of the bankruptcy court. Bankruptcy Judge Galgay had applied the automatic stay imposed by Rule 12-43 of the Rules of Bankruptcy Procedure to prohibit the appellees various subdivisions and officers of the City of New York from instituting or continuing proceedings to revoke the Certificate of Occupancy for the Debtor's nursing home. Because the district court failed to review Bankruptcy Judge Galgay's critical finding that the City was pursuing the revocation in bad faith, we reverse and remand for further findings of fact.
 
 
 2
 The Debtor, a New York partnership, owns as its sole asset a nursing home and the land it occupies at 1000 Targee Street on Staten Island. The Debtor's four partners were Bernard Bergman and three members of his family. The New York City Department of Health initially granted approval for establishing the nursing home in April of 1966, and construction began in June of 1969. Construction was completed in June of 1973, and a final Certificate of Occupancy (C.O.) was issued in June of that year. Washington Heights Federal Savings and Loan Association (Washington Federal) held a mortgage on the property of approximately $2 million.
 
 
 3
 In 1975, Bergman was indicted by a federal grand jury for filing false tax returns, submitting false Medicaid claims, making false statements to the federal government, and conspiring to commit those offenses and to defraud the government. He was also indicted by a New York State grand jury for conspiracy, filing fraudulent reimbursement claims, larceny, and obstruction of government administration. Bergman pled guilty to a violation of the New York Public Officers Law as part of a larger plea agreement that settled both the federal and state indictments against him. Under that agreement, Bergman's assets, which included his interest in this and several other nursing homes, were assigned to a state-appointed receiver for purposes of collecting a.$2.5 million judgment against Bergman held by the State. See Chase Manhattan Mortgage and Realty Trust v. Bergman (In re Bergman), 585 F.2d 1171 (2d Cir.1978).
 
 
 4
 From the building's completion until late 1979, the State of New York, which regulates the establishment and construction of nursing homes, had denied the approval necessary for the nursing home to open. The State contended that the initial establishment of the nursing home in 1966 was improper and that there was an excess of nursing home beds in Richmond County. Because the State denied that approval, the nursing home remained unopened, and the Debtor defaulted in its mortgage and tax payments.
 
 
 5
 On June 8, 1976, Washington Federal, the Debtor's mortgagee and principal creditor, commenced an action to foreclose in the Supreme Court of the State of New York, County of Richmond. On May 20, 1977, Washington Federal entered into an agreement with the City of New York to pay the delinquent real estate taxes and other assessments levied against the property. A final judgment of foreclosure and sale was entered on July 1, 1977, and the foreclosure sale was scheduled for September 1, 1977. On August 31, 1977, the Debtor filed its petition for an arrangement under Chapter XII of the Bankruptcy Act, 11 U.S.C. §§ 801-926, and the Bankruptcy Court notified all creditors, including the City of New York, of the filing of the petition. The automatic stay provision of Bankruptcy Rule 12-43 prevented the foreclosure sale scheduled for the next day.
 
 
 6
 On October 17, 1977, James L. Garrity was appointed trustee upon the Debtor's application. Faced with the State's continued refusal to approve the nursing home's establishment, Bankruptcy Judge Galgay directed Garrity to investigate other possible uses of the facility. In March of 1978, Garrity discussed with the New York State Department of Health the possibility of selling the nursing home to an Hassidic Jewish organization, and the Department agreed that it would be willing to authorize such a group to establish the home under the religious-group exception to the State's public-need requirement.
 
 
 7
 On July 18, 1978, Garrity executed a contract with Beth Rifka, Inc., the Hassidic group, for the sale of the nursing home. The parties established as a condition precedent, however, the granting of establishment approval and various other state and federal approvals. On August 24, 1979, after both Beth Rifka and Garrity had submitted information to and answered questions from various health-care bodies, the Public Health Council of the State of New York, the final state licensing authority, granting Beth Rifka's application for establishment approval subject to several minor conditions. Because of certain improper procedures on its own part, the Public Health Council afterwards rescinded its approval, resubmitted the application, and approved it once again on December 21, 1979.
 
 
 8
 During the next several months, the parties arranged financing for the sale and eventually came to an accord. However, because interest rates had risen substantially between the Health Council's approval and the spring of 1980, Beth Rifka had to obtain an additional approval from the Health Council. This final approval was obtained on September 19, 1980, and the sale was ready to be consummated, thus providing the economic foundation for the Bankruptcy Court's Chapter XII plan of arrangement.
 
 
 9
 However, a few months before the State granted the final approval and seven years after the final C.O. was issued by the City, the New York City Department of Buildings first suggested that it might initiate proceedings to invalidate the nursing home's C.O. Borough Superintendent of Buildings Philip Goldstein raised this possibility in a letter of May 7, 1980 which stated that the Debtor's intended use of the facility was a non-conforming use and that therefore he would initiate proceedings before the Board of Standards and Appeals to revoke the C.O. Under Goldstein's view of the City zoning law, the nursing home became a nonconforming use when the zoning ordinances were amended in 1974, after the C.O. was granted; and nonconforming uses forfeited their C.O.'s if they did not do business for two years, as the Debtor's nursing home clearly had not.
 
 
 10
 On June 11, 1980, Garrity's counsel advised Goldstein that the Department of Buildings was stayed, pursuant to Bankruptcy Rule 12-43, from appealing to the Board of Standards and Appeals to revoke the C.O. Goldstein thereafter advised Garrity's counsel that he intended to proceed with the revocation on the advice of the Department's counsel that the automatic stay was inapplicable. In a letter dated August 4, 1980, Goldstein applied to the Board of Standards and Appeals for such revocation without leave of the bankruptcy court. He also stated, however, that Garrity could reobtain a C.O., despite the nonconforming use, merely by requesting a Special Permit from the Board. He added that the City did not intend to oppose the grant of the Special Permit. Thus, Goldstein's letter requested revocation of the C.O. but established that the City's interest was not sufficient for it to oppose a Special Permit that would nullify the revocation.
 
 
 11
 By an order to show cause dated August 7, 1980, Garrity moved in the bankruptcy court for an order staying Goldstein, the Department of Buildings, and the Board of Standards and Appeals from instituting or continuing proceedings to revoke the Debtor's C.O., or, in the alternative, for an order adjudging Goldstein in contempt of the automatic stay imposed by Rule 12-43. Because the parties did not dispute the material facts, the bankruptcy court did not take testimony but rather invited the parties to submit proposed findings. By order dated October 8, 1980, Bankruptcy Judge Galgay granted Garrity's motion for injunctive relief and denied the alternative order of contempt. He first held that the C.O. was "property" within the exclusive jurisdiction of the bankruptcy court under section 411 of the Bankruptcy Act. He then held that Bankruptcy Rule 12-43's automatic stay of state proceedings against a debtor's property therefore applied to this Debtor's C.O. Finally, he held that the City had failed to demonstrate the good cause required for the court to vacate the stay and that the facts demonstrated that the proposed revocation of the C.O. was not a valid exercise of the police power. The bankruptcy court based that finding of bad faith on two observations. First, Bankruptcy Judge Galgay found that the City's attempted revocation was not undertaken to protect the public health and welfare of the surrounding community because, if that had been the true concern, it would not have taken seven years for the City to act. Indeed, Goldstein began the proceedings only after being prodded by three community organizations which Garrity asserts were motivated by a dislike of Hassidic Jews. Second, Bankruptcy Judge Galgay noted that the State of New York had extensively reviewed the needs of the region and of the Hassidic population, and it had concluded that the Debtor's facility would fulfill an unmet need in the community. He then held that the State's interest in administering health care was greater than the City's interest in having the Debtor obtain a Special Permit (which the City did not intend to oppose) to replace the C.O.
 
 
 12
 On February 16, 1981, while the appeal to the district court was pending, Garrity opened the nursing home, and it admitted patients for the first time.
 
 
 13
 Judge Leval reversed the order of the bankruptcy court. He concluded that state regulatory power was beyond the scope of the bankruptcy court's exclusive jurisdiction. Accordingly, the bankruptcy court could not interpret Rule 12-43's automatic stay in a manner that precluded the revocation. The district court made no finding of fact regarding the good faith of the City's conduct. Because we believe the City's good faith to be critical to this case, we reverse and remand to the district court for findings of fact on that issue.
 
 
 14
 Bankruptcy Rule 12-43, which was in effect at the time the Debtor filed its Chapter XII petition, provides that the petition "shall operate as a stay of the commencement or the continuation of any court or other proceeding against the debtor ... or of any court proceedings to enforce any lien against his property." We find Rule 12-43 sufficiently broad to stay the City's intended revocation of the Debtor's C.O. The nursing home is the Debtor's sole asset, and its establishment is critical to the Debtor's economic recovery. The C.O. which the City seeks to revoke represents the City's commitment that, when the C.O. was issued, the nursing home could legally be used for its intended purpose: 645(e) of the New York City Charter provides that a C.O. is "binding and conclusive upon all agencies and officers of the city ... unless and until the certificate is set aside, vacated or modified by the board of standards and appeals or a court of competent jurisdiction." Given the importance of the C.O. to the Debtor and the substantial weight the C.O. is accorded by the City, we cannot say that Goldstein's application for revocation is any less a "proceeding against the debtor" than a court proceeding or a pending arbitration. See Rule 12-43 of Bankruptcy Procedure, Advisory Committee Notes. Accordingly, the City's attempted revocation of the C.O. was stayed by the filing of the Debtor's petition in bankruptcy.
 
 
 15
 To proceed with the revocation, the City must petition the bankruptcy court and demonstrate cause for relieving it from the automatic stay under Bankruptcy Rule 12-43(d), (e). Proof of good cause would obviously include proof that the revocation was being sought in good faith under state and federal law. This court's opinion in Smith v. New York State Liquor Authority (In re Bay Ridge Inn, Inc.), 94 F.2d 555 (2d Cir. 1938) does not suggest that bankruptcy courts must defer to bad faith local regulation. In Bay Ridge Inn, the New York Liquor Authority had issued the debtor a liquor license scheduled to expire one year from its issuance on October 1, 1936, and the debtor filed its petition in bankruptcy in January of 1937. The Liquor Authority revoked the debtor's license and denied it any refund upon its license in June of 1937. The debtor apparently did not dispute in the district court that (1) it had never paid the deposit that was required to be paid within 30 days of the license's issuance; (2) it had attempted to assign the license in February of 1937 although the Alcoholic Beverage Control Law compelled revocation as a penalty for any attempt to assign; and (3) the custodian of the debtor's inn had been arrested for selling liquor during prohibited hours. On March 1, 1937, the debtor's trustee surrendered the license to the Liquor Authority to obtain a refund of $685.00. On June 1 of that year, however, the Authority concluded that the debtor had violated the Beverage Control Law in three instances, revoked the debtor's license, and denied it any refund because refunds were not available when a license was cancelled for violation of the Beverage Control Law. The debtor, attempting to salvage its refund, obtained an order from the district court in September of 1937 which annulled the Authority's decision.
 
 
 16
 This court reversed the district court order. There was no evidence that the Authority had acted in bad faith, and this court held that the debtor's remaining rights to a refund were properly to be determined by state tribunals.[1] Unlike Bay Ridge Inn, the debtor here is supported by the factual finding of the bankruptcy court that the City's conduct was not a valid exercise of its police power. Thus, this case presents an entirely different issue than was presented in Bay Ridge Inn, and the district court must review the finding of bad faith before determining whether the Debtor's only resort here lies in state and local proceedings.
 
 
 17
 The City argues that the new Bankruptcy Code dictates a different outcome in this case because it specifies that the automatic stay does not apply to proceedings by governmental units to enforce their police or regulatory powers. See 11 U.S.C. § 362. We disagree. First, as the City concedes, the earlier Bankruptcy Act, not the new Code, controls in this case because the petition was filed under the Act. See Guardian Mortgage Investors v. Unofficial Noteholders-Debentureholders Creditors Committee, 607 F.2d 1020, 1023 n.6 (2d Cir. 1979). Second, Congress's determination that the new Code's stay provision should not preclude enforcement of local regulation provides little direction for interpreting the stay under the Act. Instead of revealing its earlier intentions under the Act, Congress may simply have been expressing its preference for a narrower, rather than broader, application of the automatic stay in the future. Compare Katman v. New Jersey, 13 C.B.C. 524 (D.N.J.1977); In re Hillsdale Foundry Co., 2 C.B.C. 542 (W.D.Mich.1974), with Colonial Tavern, Inc. v. Byrne, 420 F.Supp. 44 (D.Mass.1976). Third, Congress removed local regulation only from the effect of the automatic stay; it did not eliminate the bankruptcy court's power to enjoin the enforcement of local regulation which is shown to be used in bad faith. Thus, although it addressed the issue, Congress did not adopt the total hands-off approach toward local regulation that the City advocates here.
 
 
 18
 Finally, we do not believe that Congress, under either the Act or the Code, intended to prohibit bankruptcy courts from protecting a debtor's assets from bad faith zoning regulation. If courts lacked that power, a city interested in the outcome of a bankruptcy petition could seriously interfere with management of the bankrupt estate through repeated threats of harmful rezoning. The Constitution authorizes Congress to establish uniform laws of bankruptcy, U.S.Const., Art. I, § 8, and it establishes that laws passed pursuant to the Constitution are the supreme law of the land, U.S.Const. Art. VI. Those grants of authority surely include the power to thwart bad faith frustration of federal bankruptcy policy.
 
 
 19
 On remand, upon the City's motion for relief from the automatic stay, the district court should review the bankruptcy court's finding of bad faith on the part of the City. We note that bad faith here means more than an erroneous determination of law or fact. Rather, the trustee must show, for example, that the City seeks to enforce a law that is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence or paragraph, and in whatever manner and against whomever an effort might be made to apply it,' " Younger v. Harris, 401 U.S. 37, 53-54, 91 S.Ct. 746, 754-755, 27 L.Ed.2d 669 (1971); that the state forum is biased, e. g., Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); see McCune v. Frank, 521 F.2d 1152, 1158 (2d Cir. 1975); that the City acted in wilful disregard of the law; that City officials clearly abused their discretion in initiating proceedings against the trustee; or that the "state proceeding (was) motivated by a desire to harass," Huffman v. Pursue, Ltd., 420 U.S. 592, 611, 95 S.Ct. 1200, 1212, 43 L.Ed.2d 482 (1975), by ill will, or by any other improper motivation, cf. Central Avenue News, Inc. v. City of Minot, 651 F.2d 565 (8th Cir. 1981) and Eagle Books, Inc. v. Reinhard, 418 F.Supp. 345, 351 (N.D.Ill.1976), vacated on other grounds, 432 U.S. 902, 97 S.Ct. 2942, 53 L.Ed.2d 1073 (1977) ("The gravamen of bad faith prosecution is the lack of a reasonable expectation that valid convictions will result"). Of course, if the City shows that its officials proceeded in the usual manner upon notification of events requiring official response, there would be no evidence that the City acted in bad faith.[2]
 
 
 20
 Contrary to the City's assertions, it is neither unseemly nor unusual for the bankruptcy court to examine issues of state zoning law to determine whether the intended revocation is marred by procedural or substantive defects. We emphasize that the purpose of the bankruptcy laws to allow the trustee without delay to marshal and administer the assets of the debtor would be frustrated were state officials free to interfere with the administration of the bankrupt's estate through bad faith zoning regulation. Nor is it reasonable to require the bankruptcy court to await the correction of such abuses by the state courts. The attendant delay itself might permanently damage the estate through the inevitable dissipation of skilled personnel and goodwill. Hence, if the City's intended revocation is in bad faith, the bankruptcy court's injunction should stand.
 
 
 21
 Accordingly, we reverse and remand for proceedings consistent with this opinion.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 22
 I respectfully dissent for reasons that are well stated by Judge Leval in his opinion and order dated February 25, 1981, dissolving the injunction issued by the Bankruptcy Court, Galgay, J., barring New York City officials from seeking to revoke a certificate of occupancy that had permitted the establishment of a nursing home on the debtor's property. In my view the Bankruptcy Court lacks jurisdiction to interfere with the state's enforcement of its regulatory powers. See Smith v. New York State Liquor Authority, Inc. (In re Bay Ridge Inn, Inc.), 94 F.2d 555 (2d Cir. 1938); NLRB v. Jonas (In re Bel Air Chateau Hospital, Inc.), 611 F.2d 1248 (9th Cir. 1979); Colonial Tavern, Inc. v. Byrne (In re Colonial Tavern, Inc.), 420 F.Supp. 44 (D.Mass.1976). Absent some claim of denial of the debtor's constitutional rights and none is asserted here those state police powers rest within the exclusive jurisdiction of the state's administrative apparatus, with the debtor having the same right as any other citizen to obtain state judicial review. A federal bankruptcy court is not a super-City Planning Commission or Board of Standards and Appeals.
 
 
 23
 Nothing in the Bankruptcy Act confers upon the Bankruptcy Court, a statutory tribunal of limited jurisdiction, any of the powers which the majority would permit it to exercise here. Strong federal-state comity considerations militate against federal intervention into state zoning matters that are not attacked on constitutional grounds. No showing is made that state remedies are inadequate. With due respect for the able bankruptcy judge's expertise in bankruptcy matters, he would not ordinarily possess the qualifications of the appropriate state bodies to determine whether the City's zoning regulations would be violated, whether the nursing home here would "fulfill an unmet need in the community," and whether any benefit a nursing home would confer is outweighed by other considerations, such as excessive burdens on the community, traffic congestion, lack of adequate parking space or roads, inadequate off-street loading facilities, or the like. These are matters that the appropriate city administrative facility and state court are in a much better position to evaluate than a bankruptcy judge.
 
 
 24
 Aside from its lack of expertise and qualifications to determine the reach of local zoning regulations, the Bankruptcy Court should not for another reason be empowered to enjoin the state's exercise of its regulatory powers. There is a fundamental conflict between a bankruptcy court's interest or motivation and that of the appropriate state tribunals. The Bankruptcy Court, naturally enough, is solely interested in enhancing the value of the debtor's estate for the benefit of creditors whereas the objective of state zoning bodies is to enforce regulatory powers (whether they relate to clean air, traffic, housing, size of residence units, or type of land use) for the benefit of the community at large. Lastly, we should note that if the Bankruptcy Court can prevent a state regulatory agency from taking action that might lessen the value of the estate, nothing would prevent it from enjoining the state from invoking other state laws that might affect the bankrupt, such as those calling for revocation of a license for cause or lapse, prohibiting the erection of advertising signs, prescribing fire control or safety regulations, authorizing criminal proceedings, or the like.
 
 
 25
 The majority, as a jurisdictional basis for the Bankruptcy Court's action here, relies on the automatic stay provisions of Bankruptcy Rule 12-43. However, as Congress made clear in its later more detailed codification of the law in the new Bankruptcy Code, Rule 12-43 was never intended to permit a Bankruptcy Court to interfere with a governmental unit's enforcement of its police or regulatory power, see Bankruptcy Code, § 362(b)(4), 11 U.S.C. § 362(b)(4). Moreover, as Learned Hand has wisely warned, "it is a commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning," Peter Pan Fabrics Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960). Equally appropriate for present purposes are his remarks in Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (concurring opinion), where he stated:
 
 
 26
 "It does not therefore seem to me an undue liberty to give the section as a whole the meaning it must have had, in spite of the clause with which it begins.... There is no surer way to misread any document than to read it literally; in every interpretation we must pass between Scylla and Charybdis; and I certainly do not wish to add to the barrels of ink that have been spent in logging the route. As nearly as we can, we must put ourselves in the place of those who uttered the words, and try to divine how they would have dealt with the unforeseen situation; and, although their words are by far the most decisive evidence of what they would have done, they are by no means final."
 
 
 27
 See also Federal Deposit Insurance Corp. v. Tremaine, 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, C.J.) ("There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it"). The purpose of Rule 12-43 was to supplement and reinforce the Bankruptcy Court's exclusive jurisdiction over property in its possession in order to avoid creation or enforcement of liens by third parties. It is questionable whether a Certificate of Occupancy may be classified as "property,"[1] but even if it were, it automatically ceased to exist as such as a matter of law in the present case when it lapsed under New York City Zoning Resolution, § 52-61,[2] by reason of the permittee's admitted non-exercise of the certificate for a continuous period of two years prior to 1976.
 
 
 28
 The majority, apparently recognizing that the automatic stay provisions of the Act may have no application, nevertheless asserts that the Bankruptcy Court has power to enjoin the "bad faith" enforcement of local state regulations.[3] I disagree. Such an exception would result in Bankruptcy Court mini-trials of purely state regulatory issues whenever, as might be expected to happen frequently, the debtor sought by claiming "bad faith" to have those issues tried in a Bankruptcy Court, which would be sympathetic toward any resolution that would improve the estate, rather than before state tribunals. The proper remedy is to seek redress in the state courts, which may be expected not to tolerate bad faith conduct on the part of any regulatory officials.
 
 
 29
 Nor does the record in the present case support a claim that the Borough Superintendent of Buildings acted in bad faith. Although a Certificate of Occupancy was issued to the debtor on June 11, 1973, the property remained vacant for many years and was not operated as a nursing home until 1980. In the meantime, on January 10, 1974, the City's Board of Estimate amended Zoning Resolution § 74-90 to prohibit the use of property as nursing homes except by special permit granted by the City Planning Commission upon its making certain findings as to landscaping, topography, supporting neighborhood services, traffic and benefits to the community. Since the debtor's property had not, prior to January 10, 1974, ever been used as a nursing home, this use could not thereafter be permitted as a matter of right and must be treated as a "non-conforming" use, Zoning Res. § 12-10, for which a special permit would be required under Zoning Res. § 74-90. Moreover, under Zoning Res. § 52-61 the right to use the property for a nursing home evidenced by the Certificate of Occupancy automatically lapsed and ceased to exist by reason of the non-use of the property as a nursing home for a continuous period of two years after the issuance of the Certificate. All of these regulations are laws of general application which were not directed toward the debtor. The proposed revocation of the debtor's Certificate of Occupancy therefore amounts merely to a ministerial act mandated by the law. When his attention was brought to the existence of this non-conforming use, the Borough Superintendent of Buildings instituted the revocation proceeding now pending before the Board of Standards and Appeals.
 
 
 30
 In view of this undisputed history I find nothing in the record to suggest bad faith on the part of the Borough Superintendent of Buildings. Nor did Judge Galgay find bad faith, as the majority states; he found that the action was "not within the valid exercise of its police power under the zoning laws" because of the Borough Superintendent's delay in bringing the revocation proceeding. To this appellant suggests bad faith based on the fact that the Superintendent was instigated to act by community complaints. In my view, to suggest that this indicates "bad faith" borders on the absurd. The delay in the City Department's institution of a ministerial action, when there was no existing violation of law because the debtor was not using the property as a nursing home and might never do so (in view of the continued refusal of the Public Health Council of the State of New York to grant a nursing home license), is so insignificant that it provides no basis for any inference as to later motive or intent. The Department of Buildings cannot be expected to be aware of all instances where such action is required. The fact that the lapse of the Certificate of Occupancy was brought to the Borough Superintendent's attention by a community group opposed to the nursing home use and hence having an axe to grind does not taint the Borough Superintendent's motive or action. This is probably the most common manner in which threatened violations of law are brought to the attention of most law enforcement authorities, state or federal.
 
 
 31
 Finally, the best evidence that the Borough Superintendent, once the matter was brought to his attention, was merely doing his job, without fear or favor, lies in his advice to appellant Trustee that if the latter pursued the proper legal course by seeking a special permit for nursing home use from the City Planning Commission the Department of Buildings would not oppose the application. Indeed, since the City was under no obligation to remain neutral in the matter, this was evidence of the Borough Superintendent's good faith in enforcing the law. There is not one whit of evidence that in bringing the revocation proceeding he was discriminating against appellant by permitting other similarly-situated holders of lapsed Certificates of Occupancy nevertheless to operate without such certificates.
 
 
 32
 For the foregoing reasons I would affirm the judgment of the district court.
 
 
 
 [1]
 Colonial Tavern, Inc. v. Byrne (In re Colonial Tavern, Inc.), 420 F.Supp. 44 (D.Mass.1976) also did not involve any assertion of bad faith on the part of state and local officials. Similarly, doctrines of federal abstention in deference to state proceedings have consistently not applied in cases of bad faith conduct by the state. See Juidice v. Vail, 430 U.S. 327, 338, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977); Huffman v. Pursue, Ltd., 420 U.S. 592, 611, 95 S.Ct. 1200, 1211, 43 L.Ed.2d 482 (1975); Younger v. Harris, 401 U.S. 37, 53-54, 91 S.Ct. 746, 754-55, 27 L.Ed.2d 669 (1971)
 
 
 [2]
 If a private citizen instigated the proceeding against the debtor to harass or coerce the debtor in an unrelated matter, the trustee may have a cause of action for damages against that party for malicious abuse of legal process. See 1 F. Harper & F. James, The Law of Torts § 4.9, at 330-31 (1956)
 
 
 [1]
 Even if a Certificate of Occupancy is treated as a property right, it is expressly conditioned upon the power of the Board of Standards to vacate or modify it. Section 645(e) of the New York City Charter provides:
 "every certificate of occupancy shall, unless and until set aside, vacated or modified by the board of standards and appeals or a court of competent jurisdiction, be and remain binding and conclusive upon all agencies and officers of the city, and shall be binding and conclusive upon the department of labor of the state of New York, as to all matters therein set forth, and no order, direction or requirement affecting or at variance with any matter set forth in any certificate of occupancy shall be made or issued by any agency or officer of the city, or by the department of labor of the state of New York, or any commission, board, officer or member thereof, unless and until the certificate is set aside, vacated or modified by the board of standards and appeals or a court of competent jurisdiction upon the application of the agency, department, commission, officer or member thereof seeking to make or issue such order, direction or requirement...." (Emphasis supplied).
 
 
 [2]
 New York City Zoning Resolution, § 52-61, provides in pertinent part:
 "If, for a continuous period of two years, either the non-conforming use of land with minor improvements is discontinued, or the active operation of substantially all the non-conforming uses in any building or other structure is discontinued, such land or building or other structure shall thereafter be used only for a conforming use. Intent to resume active operations shall not affect the foregoing."
 
 
 [3]
 Appellant concedes that the Bankruptcy Court lacks jurisdiction to prevent good faith enforcement of state zoning regulations and contends that the issue is whether it has jurisdiction to enjoin bad faith enforcement, stating:
 "This Court is not, as the City suggests, faced with deciding whether a bankruptcy court is vested with power to prevent good faith enforcement of zoning regulations in order to protect health, safety and welfare. It is beyond peradventure that the bankruptcy court cannot and should not do so. Here the issue is the City's lack of good faith." (Appellant's Reply Br. at 1; emphasis in original)