In re LAWSON BURICH ASSOCIATES, INC., d/b/a Lawson Life Extension Institute, Debtor.

LAWSON BURICH ASSOCIATES, INC., d/b/a Lawson Life Extension Institute, Plaintiff,

v.

David AXELROD, New York State Commissioner of Health, et al., Defendants.

No. 82 Civ. 5383 (RWS).

United States District Court, S.D. New York.

June 29, 1983.

Arutt, Nachamie, Benjamin, Lipkin & Kirschner, P.C., New York City, for plaintiff; Alex Spizz, Dion F. Hausman, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendants; Stuart J. Susser, Gerald Slotnik, Asst. Attys. Gen., New York City, of counsel.

## OPINION

SWEET, District Judge.

This is an appeal by debtor Lawson Burich Associates, Inc., d/b/a Lawson Life Extension Institute, ("the Debtor") from an order of the Honorable Roy Babitt, Bankruptcy Judge, filed on June 2, 1982, denying injunctive relief and a requested contempt against the respondents, David Axelrod, the

New York State Commissioner of Health ("the Commissioner"), Robert Abrams, the Attorney General of the State of New York ("the Attorney General"), and the Honorable Joseph J. Dowd, Justice of the Supreme Court of the State of New York, Kings County (the respondents collectively "the State"). The order is affirmed for the reasons set forth below.

*The Situation Prior to Bankruptcy*

The Haym Salomon Home for the Aged (the "Home") is a residential health care facility created pursuant to section 2801–a of the New York Public Health Law (McKinney's 1977 & 1982 Supp.), operating at 2300 Cropsey Avenue, Brooklyn, New York. In 1980, the federal and state governments sought to revoke Haym Salomon's provider agreements in connection with the Medicaid and Medicare reimbursement programs, and the Home brought an action to prevent the termination. A class action seeking similar relief was initiated.

A settlement was reached in accordance with which the Debtor became the voluntary receiver, pursuant to section 2810(1) of the New York Public Health Law, (McKinney's 1977).[1] The Debtor would operate the Home until such time as it received its own permanent operating certificate, at which time the assets of the Home would be transferred directly to the Debtor. A receivership agreement of March 21, 1980 (the "Agreement") was entered by and between the Home, the State of New York, Department of Health (the "Department") and the Debtor. On August 1, 1980, the Department issued operating certificates to the Debtor as Receiver. The March 21, 1980 receivership agreement was extended several times, with the last extension dated February 8, 1982.

The Agreement provided in paragraph 2.05 that:

The receiver (debtor) shall be reimbursed by the Home for reasonable and necessary expenses it incurs for supplies, equipment purchases and fees paid to individuals, whether or not they are receiver employees, relating to operation of the facility, to the extent said are reimbursable by Medicare and Medicaid, unless such costs are accepted in taking over as liabilities by the receiver, when and if the property and operation of the facility is transferred to the receiver, under its own name and its own operating certificate.

During the two years in which the Agreement was in effect, certain officers of the Debtor received compensation and reimbursement for expenses, pursuant to paragraph 2.05 of the Agreement. The Department, however, took the position that the payments were actually receivership fees, which were not as yet due.

At some time prior to February 8, 1982, the Department learned that certain monies were taken as a receivership fee in excess of $150,000. In view of these matters, the Department extended the original contract for a limited period of four months (from February 8, 1982 to June 1, 1982 midnight) and imposed several new conditions on the Receiver which required that no receivership fees be collected, that an accounting be filed, that fees paid out of the general account of the Receiver be returned, that Bartholomew J. Lawson resign from the Receiver as stockholder, officer and director, and that certain documentation be provided.

The Department concluded that the Receiver had failed to comply with certain provisions of the Agreement and the new provisions included in the February 8 exten-

---

1. Section 2810(1) reads as follows:
§ 2810. Residential health care facilities; receivership
1. The owner or owners of any residential health care facility may at any time request the department to take over the operation of such facility by the appointment of a receiver. Upon receiving such a request, the department may, if it deems such action desirable, enter into an agreement with any such owners on the appointment of a receiver to take charge of the facility under whatever conditions as shall be found acceptable by both parties. Receivership commenced in accordance with the provisions of this subdivision shall terminate at such time as is agreed upon by the parties, or at such time as either party notifies the other in writing that he wishes to terminate such receivership.

sion agreement. By letter dated May 26, 1982, Raymond D. Sweeney, Executive Deputy Director, Office of Health Systems Management ("Sweeney"), notified the Debtor: 1) that it had failed to meet the contractual obligations imposed upon it; 2) that the Public Health Council had made a negative finding as to the character of the appellant with respect to its previous application for establishment as the permanent operator of the Home; and 3) that the proposed disapproval of the establishment application on May 26, 1982 by the Council resulted in the Department exercising its right under paragraph 1.03 of the March 21, 1980 Agreement to terminate the temporary receivership. The February 8, 1982 letter had extended the Agreement until June 1, 1982 and under paragraph 1.03, the Agreement could be terminated sooner if the Department:

> ... determines in its own discretion and by reason of its obtaining old or new information reflecting on the receiver's character and/or competency, determination of the appointment of the receiver as a receiver would be appropriate.

The May 26, 1982 letter from Sweeney stated:

> Accordingly, we have decided to exercise our right under paragraph 1.03 of the receivership agreement, to terminate the receivership agreement effective mid-

night, June 1, 1982, except, if a court so determines, the exercise of the fiscal responsibilities of the Home shall be, in whole or in part, subject to the written prior approval of the Commissioner or his designee prior to midnight, June 1, 1982. The effect of such termination is to revoke the operating certificate issued to you. Effective immediately, you are directed not to incur, assume or create any new financial obligations, responsibilities or liabilities on the part of the Home, by engaging into any new contracts, agreements, or informal discussions or arrangements, or by extending any pre-existing contracts, agreements or informal arrangements, or by withdrawing or otherwise expending funds, directly or indirectly, for the purpose of paying anticipated receiver fees, and further you are directed to prepare for an orderly transfer of the operations to your successors to insure for patients safety. All books and records, including patient records in your possession are to remain at the facility. You should be prepared to vacate the premises in a manner as may be directed by the department or by court order.

Following the May 26, 1982 letter, the Department on May 27, 1982 brought on an order to show cause pursuant to section 2810(2) of New York Public Health Law [2] in

**2.** Section 2810(2) provides as follows:

2a. As a means of protecting the health, safety and welfare of the patients in a residential health care facility, whenever the commissioner revokes the operating certificate of such a facility he shall apply to the supreme court in the county where the facility is situated for an order directing the owner of the land and/or structure on or in which the facility is located to show cause why the commissioner, or his designee, shall not be appointed receiver to take charge of the facility. In those cases where operating certificates have been revoked pursuant to paragraph (a) of subdivision five of section twenty-eight hundred six of this chapter the supreme court shall appoint a receiver who may be the commissioner or his designee. Such application shall contain proof by affidavit that the facility has had its operating certificate revoked. Such order to show cause shall be returnable not less than five days after service is completed and shall provide for personal service of a copy thereof

and the papers on which it is based on the owner or owners of the land and/or structure on or in which the facility is located. If any such owner cannot with due diligence be served personally within the county where the property is located and within the time fixed in such order, then service may be made on such person by posting a copy thereof in a conspicuous place within the facility in question, and by sending a copy thereof by registered mail, return receipt requested, to such owner at the last address registered by him with the department, or in the absence of such registration, to the address set forth in the last recorded deed with respect to such facility. Service shall be deemed complete on filing proof of service thereof in the office of the county clerk, or the clerk of the city of New York, as the case may be.

b. On the return of said order to show cause, determination shall have precedence over every other business of the court unless

the State Supreme Court, Kings County, to have the Commissioner of Health appointed as interim receiver of the Home pursuant to New York Public Health Law §§ 2801–c (McKinney's 1977),[3] and 2810(2), as well as to have all funds due and owing to the Home turned over to the Commissioner, and to enjoin any further actions of the Debtor as operator of the Home. The order to show cause was served on the Debtor on May 28, the Friday before the Memorial Day weekend, and made returnable at 10:00 a.m. on June 1, the next business day.

*Proceedings after Bankruptcy*

On June 1, at 9:07 a.m., prior to the hearing on the Department's order to show cause, the Debtor filed a petition for reorganization under Chapter 11 of the Bankruptcy Code asserting that the Agreement and the operating certificates, as well as all of its assets, were property of the Debtor and that section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), stayed any acts on the part of the State to divest the Debtor of its property or property rights.

Several hours after the filing of the petition, the State's order to show cause came on to be heard before the Honorable Joseph J. Dowd, Justice of the Supreme Court, Kings County. At the hearing, Debtor's counsel informed the court that the petition for reorganization had been filed, that the Commissioner was stayed from terminating the operating certificate as of midnight of June 1, and that pursuant to section 362(a), the proceeding brought on by the Commissioner was stayed. Justice Dowd heard arguments on the Commissioner's application for the appointment of a temporary and permanent receiver and then adjourned for lunch.

During the luncheon recess, the Debtor's attorney commenced an adversary proceeding seeking to hold the Commissioner of Health, the Attorney General and Justice Dowd, in contempt for a violation of section 362 of the Bankruptcy Code, and to enjoin them from continuing with any action or proceeding against the Debtor, including the order to show cause to establish a temporary and permanent receiver. In that connection, Judge Babitt signed an order to show cause returnable the following day, June 2, 1982, at 12:00 noon. Judge Babitt did not grant a temporary restraining order pending the June 2 hearing. Justice Dowd, after being informed that there was no temporary stay issued by the Bankruptcy Court, granted the Department's application for a temporary receiver pending a

---

the court shall find that some other pending proceeding, having similar statutory precedence, shall have priority. The court may conduct a hearing at which all interested parties shall have the opportunity to present evidence pertaining to the application. If the court shall find that the facts warrant the granting thereof, then the commissioner, or any person designated by the commissioner, shall be appointed receiver to take charge of the facility, and the court shall determine a fair monthly rental for the facility, taking into account all relevant factors, including the condition of such facility, which amount shall, except in the case where the receiver is assuming an existing bona fide arm's length lease, not exceed the amount which would be reimbursable to the facility under the medical assistance program for real property costs if each patient in the facility were a recipient of medical assistance. Such rental shall be paid by the receiver to the owner or owners of the facility for each month that the receivership remains in effect.

**3.** Section 2801–c reads:

Injunctions

The supreme court may enjoin violations or threatened violations of any provisions of this article; and it may enjoin violations of the regulations of the department adopted thereunder. Upon request of the public health council or the commissioner, the attorney general shall maintain an action in the supreme court in the name of the people of the state to enjoin any such violation. Notwithstanding any limitation of the civil practice law and rules, such court may, on motion and affidavit, and upon proof that such violation is one which reasonably may result in injury to any person, whether or not such person is a party to such action, grant a temporary injunction upon such terms as may be just, pending the determination of the action. No security on the part of the people of this state shall be required. In any action for injunction brought pursuant to this article, any finding of the public health council or the commissioner or hearing officer designated by either shall be prima facie evidence of the fact or facts found therein.

hearing and determination of the issues before the Bankruptcy Court.

On June 2, 1982, the order to show cause seeking to enjoin the Commissioner of Health, the Attorney General and Justice Dowd, was heard before Judge Babitt. Judge Babitt initially held that under the State's position, the contract was to be terminated as of midnight June 1, 1982, and the Debtor's filing of the petition at 9:07 a.m. on June 1, 1982 prevented the State from taking any action to terminate the Agreement. Judge Babitt also initially found that there was no evidence that the health, well-being and safety of the patients of the Home were in danger. In the course of the hearing, Judge Babitt made the following statements:

I don't think in the absence of a showing that the health and welfare of the patrons of the residence is impaired that I should necessarily undue the administration. I don't see how we can do the elderly in that home any good by, in mid-stream, switching to another receiver. No one has told me they are abusing the people. I know you did not.

(Transcript, June 2, 1982, p. 48)

Nothing you [attorney representing the Department] said to me tells me they are ineffectual to run a home from the standpoint of what is the most important consideration, the health and well-being of residents. I don't give a hoot ... I am telling you I am a court of equity; I am telling you my jurisdiction attached while the people are still running this home. Nobody has shown me a single instance in which any of the residents has suffered and I suspect, frankly, coming into Bankruptcy Court and being before the State Supreme Court these people would be more on their toes to make sure none of these people suffered ...

(Transcript, June 2, 1982, pp. 48, 49)

As far as I am concerned these debtors were in possession at the moment of filing. Judge Dowd's action in appointing a temporary receiver because you told him that the contract had terminated—he had

no right and you had no right because you were stayed from terminating.

(Transcript, June 2, 1982, p. 61)

Counsel for the Department of Health responded:

We were not stayed pursuant to Bankruptcy Law 362(b)(4).

(Transcript, June 2, 1982, pp. 61–62)

and the court responded:

This is not an exercise of police powers.

(Transcript, June 2, 1982, p. 62)

Judge Babitt determined to restore the Debtor to its facilities and allow the proper administrative agency to determine at a due process hearing whether or not the Debtor would be granted a permanent operating certificate. The Attorney General sought a stay pending appeal of the order, and upon denial of the stay, requested the Judge to file a memorandum order to enable immediate review for a stay of his order. Judge Babitt, thereafter, stayed his order until 3:00 p.m. and signed a memorandum order which stated in part as follows:

The application to punish is denied. The automatic stay is ineffective to deter the upholding of the proper procedures called for by state law and rules to determine whether this debtor will continue to operate this nursing home. However, pending such final decision, the debtor is restored to the status it had when the petition was filed prior to 12 midnight of June 1, 1982. The Court under § 305, therefore, suspends further administration under Chapter 11. So Ordered.

Approximately one hour after Judge Babitt issued the above order, he called the parties back into his chambers, vacated the above order, and issued a new memorandum order, which stated as follows:

Following presentation of the legal positions, the court is satisfied that there is no basis upon which to hold any of the cited respondents in contempt. The court declares that there is no automatic stay under § 362(a), as in the matter of the operation of nursing home facilities, peculiarly the province of state regulation, the court is particularly sensitive to the needs of the residents of those facilities &

the state's proper exercise of its power —§ 362(b)(4). The matter of the operation of this facility is left to unfold under applicable law & rules before either or both the proper administrative tribunals & the judicial tribunal.

It is so ordered.

It is from this subsequent order of Judge Babitt that the Debtor appeals.

About an hour after Judge Babitt's second memorandum order, the parties appeared before Justice Dowd in State Supreme Court. A full presentation of the events which had just occurred before Judge Babitt was provided by counsel to Justice Dowd, including copies of the memorandum orders. After oral argument was presented, Justice Dowd proceeded to appoint David Axelrod, M.D., Commissioner of Health, as the permanent receiver of the Home rather than the temporary receiver, and ordered that all books, records, etc. be turned over to the Commissioner as receiver by the Debtor.

*Discussion*

The relevant automatic stay provision of the Bankruptcy Code provides:

§ 362: *Automatic Stay*

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

. . . . .

(3) any act to obtain possession of property of the estate or property from the estate;

The exceptions to the automatic stay include:

(b) The filing of a petition under section 301, 302 or 303 of this title does not operate as a stay—

(4) under subsection (a)(1) of this section of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

The Debtor's principal argument is that section 362(a)(1) applies here and that the exception in section 362(b)(4) does not. However, the Debtor does assert that section 362(a)(3) is applicable as well as section 362(a)(1).

■ The Debtor has not set forth any authority to support its assertion that property held by a receiver such as itself falls within the scope of section 362(a)(3). The Debtor points to nothing in the New York Public Health Law or the March 21, 1980 contract indicating that the temporary receiver was given any right, title or ownership interest in the property of the Home, or of that acquired while acting in the capacity of receiver, all of which is part of reimbursable costs and expenses. Article IV of the Agreement, setting forth the powers, duties, rights and obligations of the Receiver, includes "those accorded a receiver appointed in an action to foreclose a mortgage on real property and in equity. *Cf. Securities & Exchange Comm'n v. First Fin. Group of Texas,* 645 F.2d 429, 439 (5th Cir.1981) (judicial appointment of temporary receiver after Chapter XI petition filed does not violate automatic stay provision of section 362(a)(3)).

Article 3.02 of the Agreement executed on March 21, 1980 provides:

All items personal and real property and equipment in the Facility's premises on the effective date of the agreement are owned by the Facility free and clear of any liens and are hereby made available for use in the operation of the Facility by the Receiver; and the same shall be available to the Receiver when the property and operation of the Facility is transferred to the Receiver in its own name and under its own operating certificate.

No other provision defines the ownership status of the property of the Home and the

contemplated transfer to the Debtor never took place. Instead, the receivership was terminated.

Although it is true that the petition in Bankruptcy was filed some fifteen hours before midnight on June 1, 1982, the State did serve the May 26, 1982 notice of termination of the receivership and the order to show cause for appointment of a receiver on May 27 and 28, respectively. According to the State, as of June 1, midnight, the Agreement would have expired, and there would have been no receiver. The State had to go into court and terminate the Agreement prior to midnight to arrange for the continuation of operations of the Home. As the State points out, the Debtor retained no more than the "naked legal right to possession until midnight June 1, 1982." The Debtor has failed to show it was the owner of the Home, or in possession as an "operator" of the Home in the permanent sense as contemplated under Article 28 of the New York Public Health Law. For these and the reasons stated above, section 362(a)(3) is inapplicable. What remains at issue is the effect of the section 362(b)(4) exemption for governmental action in the exercise of its police or regulatory power.

The Debtor argues that the Hon. J. Edward Lumbard has resolved the issues presented by this appeal in *In the Matter of National Hospital and Institutional Builders Co. v. Goldstein,* 658 F.2d 39 (2d Cir.1981), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1014, 71 L.Ed.2d 303 (1982). In *Goldstein,* at issue was an attempt by the City of New York to cancel a nursing home's Certificate of Occupancy ("C.O.") in the face of an injunction issued by a Bankruptcy Judge. The City decided, seven years after the C.O. was issued, that the use of the nursing home was a nonconforming use under the

applicable zoning laws and appealed to the Board of Standards and Appeals.

The Debtor's Trustee sought a stay of the City's proceedings, and the Bankruptcy Court applied the automatic stay provision of the Bankruptcy Act, Rule 12–43,[4] which was in effect at the time the Debtor filed a bankruptcy petition. The Bankruptcy Court held that the City had failed to demonstrate good cause required for the court to vacate the previously issued stay, and that the proposed revocation of the C.O. was not a valid exercise of the police power since there was evidence that the City had been motivated by a dislike of the Hassidic Jews who operated the nursing home, and not by its concern for the public health and welfare.

The district court reversed the Bankruptcy Court, concluding that the exercise of its local regulatory power—zoning—was beyond the scope of the Bankruptcy Court's exclusive jurisdiction. The Second Circuit reversed, holding that to proceed with revocation, the City had to petition the Bankruptcy Court and demonstrate cause for relieving it from the automatic stay under Bankruptcy Rule 12–43(d)(c), and that proof of good cause would include proof that the revocation was not being sought in bad faith. 658 F.2d at 42. The court remanded the case to the district court which had not made any findings with respect to the bad faith issue. The Second Circuit stated:

> On remand, upon the City's motion for relief from the automatic stay, the district court should review the bankruptcy court's finding of bad faith on the part of the City. We note that bad faith here means more than an erroneous determination of law or fact.

In effect, the Second Circuit held that under the old Bankruptcy Act,[5] the Bankrupt-

---

**4.** Bankruptcy Rule 12–43 provided that the petition "shall operate as a stay of the commencement or the continuation of any court or other proceeding against the debtor ... or of any court proceedings to enforce any lien against his property."

**5.** The Second Circuit found that the earlier Bankruptcy Act, not the new Code controls because the petition was filed under the Act.

658 F.2d at 43. The court, however, noting the Code's specific exemption for enforcement of local regulation, section 362(b)(4), concluded that "Congress removed local regulation only from the effect of the *automatic* stay; it did not eliminate the bankruptcy court's power to enjoin the enforcement of local regulation which is shown to be used in bad faith." *Id.*

cy Court, having applied the automatic stay, had jurisdiction to consider whether there was a valid exercise of police power which would justify lifting the stay. The issue, of course, was whether the City had acted in good faith.

*Goldstein* presented the Second Circuit with a situation different from the one at bar. The C.O. was a property right which was continuing. Here, the Agreement was to expire June 1. In *Goldstein,* the Bankruptcy Court had already applied the automatic stay and the issue was whether to lift it. Here, the State instituted proceedings before the Bankruptcy petition was even filed, and Judge Babitt declined to apply the stay, finding the exemption in section 362(b)(4) applicable. Finally, there is no allegation of "bad faith" in this case, as there clearly was in *Goldstein.* For these reasons, Judge Babitt's ruling was not inconsistent with the principles articulated in *Goldstein.*

In addition, the Debtor has argued that the legislative history as reflected in *In re King Memorial Hospital, Inc.,* 4 B.R. 704 (U.S.Bkrtcy., S.D.Fl.1980), and the reasoning in *Muzio, Commissioner of Motor Vehicles, State of Connecticut v. Sampson,* 17 B.R. 528 (U.S.Bkrtcy.D.Conn.1982); *In the Matter Theobald Industries, Inc. v. Local 786 International Chemical Workers Union, AFL–CIO,* 16 B.R. 537 (U.S.Bkrtcy., D.N.J. 1981); and *In re State of Missouri,* 7 B.R. 974 (D.E.D.Ark.1980), *aff'd,* 647 F.2d 768 (8th Cir.1981), *cert. denied,* 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982), stand for the proposition that if the State's powers are exercised in connection with the Debtor's financial or pecuniary obligations, rather than the State's health and safety concerns, the section 362(b)(4) exemption is inapplicable.

■ It is undisputed that section 362(b)(4) is to be narrowly construed "in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate." 11 U.S.C.A. § 362 note.

However, in *In re King, Sampson, Theobald Industries,* and *In re State of Missouri,* the statutes pursuant to which the state sought to act were found to have been enacted primarily for financial reasons, or the interests which the State sought to protect in acting were found not to be primarily those of public health and welfare. *See In re King, supra,* 4 B.R. at 708–09 ("state statutes put before this Court do not appear to be enacted to protect the health and welfare of its constituents"); *Sampson, supra,* 17 B.R. at 531 ("[t]he state statute is not a highway safety statute designed to keep incompetent drivers off the road. Rather, it is apparent that the intended and actual effect of the statute is to protect the pecuniary interests of judgment creditors."); *Theobald Industries, supra,* 16 B.R. at 539 ("the N.L.R.B. proceedings at issue, although regulatory in nature, primarily relate to the protection of the pecuniary interest in the debtor's estate and not to matters of public safety and health."); *In re State of Missouri,* 7 B.R. at 981 ("it is plain Petitioners are not endeavoring to prevent a violation of consumer protection, environmental protection, fraud or a similar police or regulatory law involving safety, morals and the general welfare of society, but on the contrary, Petitioners' sole objective is to protect the pecuniary interests in property of purported depositors."). With respect to *Theobald Industries,* it should be noted that a contrary result was reached by the Fifth Circuit in *National Labor Relations Bd. v. Evans Plumbing Co.,* 639 F.2d 291, 293 (5th Cir.1981) (per curium).

■ This is not a case in which the State's effort to revoke a health facility's license was automatically triggered by the hospital's discontinuance of operations, the discontinuance being directly related to the hospital's financial difficulties. *See In re Saugus Gen. Hospital, Inc.,* 19 C.B.C.2d 651 (B.C.D.Mass.1978). Here, the State was acting so that the Home could continue in operation with appropriate funding. Indeed, "public health and welfare would seem to be further advanced by continuation of the hospital facility." *Id.* at 658.

The Debtor concedes that the New York Public Health Law was enacted to protect the health, safety and welfare of people. Indeed, the declaration of policy and statement of purpose of Article 28 reads as follows:

Hospital and related services including health-related service of the highest quality, efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health. In order to provide for the protection and promotion of the health of the inhabitants of the state, pursuant to section three of article seventeen of the constitution, the department of health shall have the central, comprehensive responsibility for the development and administration of the state's policy with respect to hospital and related services, and all public and private institutions, whether state, county, municipal, incorporated or not incorporated, serving principally as facilities for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition or for the rendering of health-related service shall be subject to the provisions of this article.

As noted by Judge Babitt in his second order regarding "the matter of operation of nursing home facilities, peculiarly the province of state regulation, the court is particularly sensitive to the needs of the residents of those facilities and the state's proper exercise of its power."

However, the Debtor claims that the State has used the law "in an attempt to enforce what it deems to be its pecuniary interests," and that the State is thereby "abusing the laws by ignoring the purpose for which they were enacted." The Debtor complains that the State's "entire discussion involves *money*" and that the State "repeatedly refers to *financial* matters" and that such references bar the State from relying upon its police power.

It is obvious that if in fact the Debtor was improperly diverting funds that were to be used for the proper care of patients, the health and welfare of the patients may be jeopardized. And, of course, if such diversion of funds seriously impairs the viability of a facility, the State acts in the public interest when it seeks to keep the facility in operation. Indeed, in his affidavit supporting the order to show cause, Sweeney stated:

This protection is sought now because the individual respondents have already taken to date unauthorized payments in excess of $150,000 as receiver fees, and have, for the last nine days blocked complete access to the Department's auditors to the Receiver's books and records, in violation of PHL § 2803 and paragraph 5 of the February 8, 1982 extension agreement (Exhibit E). The Department, in order to protect the viability of the Home and the safety and welfare of its residents, implores the Court to grant the relief requested to insure that in the period of time before the return date of the order to show cause for the appointment of a new receiver, no more funds will be removed from the Receivership's accounts. The amount of revenue received by the Receiver is very substantial, amounting, in Medicaid funds alone, to approximately $85,000 per week. *This money is needed for the proper care of patients and management of the Home.* If any more of these State funds are removed by the respondents before the return date of this Order to Show Cause (for their personal use), *it will seriously impair the viability of the facility.* (emphasis added).

The State further argues:

In the case at bar, debtor/appellant had misappropriated funds necessary to the continued operation and viability of the Home. In time, without corrective action being taken by the Commissioner, the Home's resources would have been totally depleted as well as the personal accounts of the residents.

(Brief of Defendants-Respondents, p. 26). According to the Department, the financial practices of the Receiver imperilled the operation of the Home, an institution which is regulated clearly in the public interest in the "health and safety of its residents."

Certainly, there are circumstances under which improvident financial management impacts the general welfare of a facility, and in turn, its residents. In light of this, I cannot conclude that Judge Babitt abused his discretion in finding the section 362(b)(4) exemption applicable, and his second order of June 2, 1982 is affirmed. Enter judgment dismissing the appeal.

IT IS SO ORDERED.