In re FARMERS & RANCHERS LIVE-
STOCK AUCTION, INC., Debtor.

In re Billy Gene and Mary Lavone
DAVIS, Debtors.

Billy Gene DAVIS and Mary Lavone
Davis, Plaintiffs,

v.

UNITED STATES of America, et
al., Defendants.

FARMERS & RANCHERS LIVESTOCK
AUCTION, INC., Plaintiff,

v.

UNITED STATES of America, et
al., Defendants.

Bankruptcy Nos. 84–09, 84–10.
Adv. Nos. 84–128, 84–131.

United States Bankruptcy Court,
E.D. Arkansas, N.D.

Dec. 10, 1984.

Ben F. Arnold, Little Rock, Ark., for debtors.

Richard L. Ramsay, Pine Bluff, Ark., James D. Foyil, Camden, Ark., James E. Smith, Jr., Little Rock, Ark., John C. Gregg, Batesville, Ark., Marvin Thaxton, Newport, Ark., Gary Vinson, Blair Arnold, Batesville, Ark., John R. Tisdale, James C. Clark, Jr., Little Rock, Ark., H. David Blair, Batesville, Ark., Kaneaster Hodges, Newport,

Ark., Chalk Mitchell, Henry Hodges, A. Wayne Davis, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Bankruptcy Judge.

## MEMORANDUM OPINION

■ Pending for determination are complaints filed by the corporate debtor, Farmers & Ranchers Livestock Auction, Inc. ("Farmers & Ranchers"), and the individual debtors, Billy Gene Davis and Mary Lavone Davis. The corporate and individual debtors seek to enjoin the United States of America, acting through the Secretary of Agriculture and the Packers and Stockyards Administration, from conducting investigations and administrative proceedings which could result in suspension of their licenses and the licenses of Randy Davis, d/b/a Cattleman's Commission Company, to operate as either market agencies or dealers or both.[1] The events leading to

1. The Packers and Stockyards Administration of the United States Department of Agriculture, under the authority of the Secretary of Agriculture (the "Secretary"), is the regulatory agency charged with administering the Packers and Stockyards Act, 1921, as amended, 7 U.S.C. §§ 181, *et seq.*, and the regulations promulgated thereunder. As such, the Packers and Stockyards Administration has jurisdiction over stockyards, market agencies and dealers like debtors and Randy Davis, son of the individual debtors. (All references to title 7 of the United States Code are to the 1982 edition. All references to title 9 C.F.R., and to the regulation effective January 1, 1984.)

Relevant definitions are set forth in the Act as follows:

§ 202. [7 U.S.C. § 202] Stockyard defined; determination by Secretary as to particular yard

(a) When used in this subchapter the term "stockyard" means [a]ny place, establishment or facility commonly known as stockyards, conducted, operated or managed for profit or non-profit as a public market for livestock producers, feeders, market agencies and buyers, consisting of pens, or other inclosures and their appurtenances, in which live cattle, sheep, swine, horses, mules or goats are received, held, or kept for sale or shipment in commerce.

§ 201. [7 U.S.C. § 201] "[M]arket agency"; "dealer"; defined

(c) The term "market agency" means any person engaged in the business of (1) buying or selling in commerce of livestock on a commission basis; or (2) furnishing stockyard services; and

(d) The term "dealer" means any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser.

§ 201.2 [C.F.R. § 201.2] Terms defined

(c) "Secretary" means the Secretary of Agriculture of the United States, or any officer or employee of the Department authorized to act for the Secretary.

(d) "Administration" or "agency" means the Packers and Stockyards Administration.

(e) "Administrator" or "agency heads" means the Administrator of the Administration or any person authorized to act for the Administrator.

(f) "Regional Supervisor" means the regional supervisor of the Packers and Stockyards Administration for a given area or for any person authorized to act for the regional supervisor.

According to the regulations promulgated under the Act, the administrator for the Packers and Stockyards Administration has authority to enforce the provisions of the Act and its regulations. 9 C.F.R. § 201.3.

this litigation began in January of 1984 when the Packers and Stockyards Administration began an investigation into the activities of the corporate and individual debtors.

These adversary proceedings were consolidated and tried before the Court on October 26, 1984 for a determination of the following issues:

## I.

Whether the nature and scope of the proposed administrative proceedings and continuing investigations by the Packers and Stockyards Administration fall within the exception to the automatic stay created by 11 U.S.C. § 362(b)(4)?

## II.

Whether the Bankruptcy Court should enjoin the Packers and Stockyards Administration from initiating the proposed administrative proceedings against the debtors and Randy Davis, d/b/a Cattleman's Commission Company where the proceedings threaten to defeat the settlement agreements essential to the debtors' reorganization?

Based upon the record evidence, this Court holds that the Bankruptcy Court cannot stay or enjoin the United States of America from continuing its investigations or from filing its proposed administrative proceedings. Therefore, the Court will dismiss the debtors' adversary complaints and order other appropriate relief.

The Court has reached its decision based upon the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. In January of 1984 the Packers and Stockyards Administration began an investigation into the operation of Farmers & Ranchers. At that time Farmers & Ranchers was a livestock auction barn owned in part and operated by Billy Gene and Mary Lavone Davis.[2]

2. That investigation of the debtors began after a Georgia livestock seller or consignor complained to the Packers and Stockyards Administration that he had not received payment from the sale of his cattle either from Farmers & Ranchers or from the Davises.[3]

---

2. The named corporate officers of Farmers & Ranchers on that date were Billy Davis, President; Jerry Millspaugh, Vice-President; and Mary Davis, Secretary/Treasurer, each of whom at that time held 33⅓% of the corporation's outstanding stock.

It should be noted that Earl Patterson has also been referred to and has acted as a corporate officer for Farmers & Ranchers. For example, he signed as an officer on a corporate resolution dated January 26, 1979. On that same resolution, Earl Patterson was named, along with debtor Mary Davis, as one of the two officers who could borrow money in the name of the corporate debtor from the First National Bank, Batesville, Arkansas. Also on January 26, 1979, Earl Patterson signed as "corporate officer" along with debtor Bill Davis a $100,000 note on which Earl Patterson, debtor Bill Davis and Farmers & Ranchers were listed as debtors. A personal guaranty for Farmers & Ranchers up to $500,000 was executed by Earl Patterson on that same date.

Earl Patterson and his wife leased the auction barn facilities to Farmers & Ranchers until it closed in March of 1984.

3. There have been other investigations of debtor Billy Gene Davis by the Packers and Stockyards Administration. According to the record evidence, an investigation was conducted and an administrative complaint was filed against Billy Gene Davis in 1969 alleging custodial account shortages of $20,000 to $40,000. As a result of that investigation of Billy Gene Davis a consent decree was entered on July 29, 1970 with findings of fact as to custodial account shortages. In that decree Billy Gene Davis agreed to cease and desist from failing to make timely deposits into his custodial account in an amount equal to the proceeds received from each sale of consigned livestock.

Subsequent investigations made in approximately 1973 and 1974 to determine whether there was compliance with that 1970 consent decree resulted in an administrative proceeding being brought for injunction against Billy Gene Davis in the United States District Court for the Eastern District of Arkansas, Northern Division. In connection with that administrative action a complaint was filed on July 11, 1974 alleging custodial account shortages in 1973 ranging from $55,000 to $102,000 on dates inspected by the agency.

On October 10, 1978, based upon stipulations between the United States of America and Billy Gene Davis, the District Court entered a judg-

3. On January 25, 1984 Billy Gene Davis and Mary Lavone Davis filed a joint Chapter 11 petition. The schedules accompanying the petition reflect assets for the individual debtors in the sum of $2,769,048.38 and liabilities in the sum of $2,721,988.32, plus interest on secured debt. On the date of filing debtor Billy Gene Davis was licensed individually with the Secretary as a "dealer" to buy and sell livestock.

4. On January 27, 1984 Farmers & Ranchers also filed Chapter 11 proceedings. The schedules accompanying its petition reflect assets in the sum of $120,873.62 and liabilities in the sum of $1,240,290.18 plus interest on secured debt. At that time Farmers & Ranchers was operating stockyards at both Charlotte and Mountain View, Arkansas, and was licensed pursuant to the Packers and Stockyards Act as a market agency selling livestock on a commission basis and as a dealer buying and selling livestock.

5. At the time the debtors filed their bankruptcy petitions, Randy Davis, son of Billy Gene Davis and Mary Lavone Davis, was an employee of Farmers & Ranchers. Randy Davis has not filed bankruptcy proceedings and is currently doing business as Cattleman's Commission Company. Billy Gene and Mary Lavone Davis now work for Cattleman's.

6. At some point after the investigation began but before January 27, 1984, Mr. Bellew personally requested certain records [4] from Farmers & Ranchers and

ment against Billy Gene Davis in the sum of $500.00. The judgment also permanently enjoined and restrained Davis from violating the July 29, 1970 decree.

4. The record-keeping requirements are set forth clearly under the Act and its regulations:

**§ 221. Accounts and records of business; punishment for failure to keep**

Every packer or live poultry dealer or handler, stockyard owner, market agency and dealer, shall keep such accounts, records and memoranda as fully and correctly disclose all transactions involved in his business, including the true ownership of such business by stockholding or otherwise. Whenever the Secretary finds that the accounts, records and memoranda of any such person do not fully and correctly disclose all transactions involved in his business, the Secretary may prescribe the manner and form in which such accounts, records and memoranda shall be kept, and thereafter any such person who fails to keep such accounts, records and memoranda in the manner and form prescribed or approved by the Secretary shall upon conviction be fined not more than $5,000, or imprisoned not more than 3 years or both.

**§ 201.50 Records; disposition**

(a) Except as otehrwise provided in paragraphs (b) and (c) of this section, no stockyard owner, market agency, or dealer shall, without the consent in writing of the Administrator, destroy or dispose of any books, records, documents or papers which contain, explain or modify transactions in the business under the Act.

(b) Every stockyard owner, market agency or dealer may destroy or dispose of the following categories of records after they have been retained for a period of two full calendar years:

**Stockyard Owners.**
All feed records
Dipping and spraying orders
Vaccinations and testing orders
Orders for special services
Routine correspondence
Railroad advance charges
Bills to commission firms and others
Records of shipments by States and markets
Deposit slips
Bank statements
Cancelled checks and drafts
Check stubs
Railroad in-bound records
Truck-in receipt records
Delivery records
Yarding receipts
Pass-out and delivery orders
Truck shipping orders
Railroad shipping orders
Scale tickets
Scale test reports

**Market Agencies.**
Scale tickets
Bills from stockyard company
Bills for livestock purchased
Gate tickets
Routine correspondence
Weigh bills and truckers tickets
Accounts of sales
Accounts of purchases
Bills and invoices to buyers
Deposit slips
Bank statements
Cancelled checks and drafts
Checks stubs
Scale test reports

**Dealers.**
Bills from stockyard company
Bills for livestock purchased
Accounts of sales
Routine correspondence
Bills to purchasers
Deposit slips
Bank statements

from Billy Gene and Mary Lavone Davis. His request was denied.[5]

7. On January 27, 1984, B.H. (Bill) Jones, the Administrator of the Packers and Stockyards Administration, having been denied voluntary access to the records, then issued subpoenas to the three debtors requiring them to appear before representatives of the Secretary and to produce the following:

> All books, records, memorandum and other documentary evidence pertaining to the financial condition and livestock operations of Farmers & Ranchers Livestock Auction, Inc., Charlotte, Arkansas and Mountain View, Arkansas, for the period from January 1, 1983 to the present date including but not limited to, general ledger, cash receipts and disbursement journals, bank statements, deposit slips, cancelled checks and drafts, returned checks and drafts, bank notices, bank ·correspondence, records of accounts receivable and payable, inventory records, worksheets, purchase and sales journals, contracts, agreements, cattle advances and correspondence.

8. On March 19, 1984 debtors Billy Gene Davis and Mary Lavone Davis, his wife, as plaintiffs in AP 84–128, and debtor Farmers & Ranchers, as plaintiff in AP 84–131, filed complaints for Declaratory Judgment, Injunctive Relief and for Order Quashing Subpena [sic] Duces Tecum alleging that: (1) the actions of the Packers and Stockyards Administration in connection with its investigation were in violation of the automatic stay provision of 11 U.S.C. § 362(a); (2) the subpoenas constitute over-ly broad and burdensome requests for information already available to the United States of America; (3) information sought is subject to the attorney-client privilege as well as to the attorney work product privilege or involves a trade secret and, therefore, is not subject to discovery; (4) one purpose of the investigation was merely to determine the identity of holders of checks returned for insufficient funds so that the holders may file claims against the surety bond companies; and (5) enforcement of the subpoenas would constitute irreparable harm and damage to the debtors and would seriously impede, frustrate, and perhaps even prohibit its effective reorganization.

9. On March 30, 1984 the Administrator of the Packers and Stockyards Administration filed an answer and counterclaim for enforcement of the administrative subpoenas duces tecum.

10. On April 2, 1984, unknown to debtors, Mr. Bellew wrote a letter to Jack W. Brinckmeyer, Chief Financial Protection Branch, Livestock Marketing Division, Washington, D.C., including an investigative report on the corporate and individual debtors and recommending that a cease and desist order be sought mandating, among other things,

(1) that the dealer's license of Billy Gene Davis be suspended for two years and thereafter until solvent;

(2) that the marketing agency license and dealer's license of Farmers & Ranchers be suspended for two years and thereafter until the shortage in the custodial fund [6] is corrected; and

---

Cancelled checks and drafts
Check stubs
Scale test reports

5. Market agencies and dealers have a duty to allow inspection of those records by the Packers and Stockyards Administration upon requests. That duty is set forth in the regulations as follows:

**§ 201.95 Inspection of records and property of packers, stockyard owners, market agencies and dealers.**

Each packer, stockyard owner, market agency, and dealer shall, upon proper request during ordinary business hours, permit authorized representatives of the Secretary to enter the place of business and examine records requested pertaining to the business of the packer, stockyard owner, market agency, or dealer as such....

6. Under the Packers and Stockyards Act the custodial account is maintained to collect the proceeds from the sale of livestock to be paid to the consignor or seller of the livestock. The custodial account, a trust account, is explained in the regulations in part as follows:

**§ 201.42 Custodial accounts for trust funds.**

(a) **Payments for livestock are trust funds.** Each payment that a livestock buyer makes to a market agency selling on commission is a trust

(3) that officers of Farmers & Ranchers other than Billy Gene Davis be precluded from operating for a period of eighteen months. Mr. Bellew testified that he considered the previous investigations of Billy Gene Davis and because of the lack of the effectiveness of prior sanctions, reasoned that a more substantial sanction was needed.

The letter mailed to Mr. Brinckmeyer also reported findings of insolvency, shortages and misuse of custodial funds.[7] The letter also states that some custodial checks had been returned for insufficient funds and that debtors had failed to pay customers and had failed to pay for dealer livestock purchases.

11. On April 11, 1984 the debtors filed Motions to Dismiss the answer and counterclaim filed by the United States in this Court.

12. On April 12, 1984 an evidentiary hearing was held by this Court on debtors' Motions to Dismiss, during which the parties agreed to a temporary order which reads in part:

(1) The Bankruptcy Court shall have jurisdiction of all issues pending at this time.

(2) The counterclaim of the United States and the Motion to Dismiss will be held in abeyance at this time.

(3) The debtors will provide the following records at the Charlotte, Arkansas, location at 9:00 a.m., Wednesday, April 18, 1984 for inspection and copying by the United States of America: [8]

\* \* \* \* \* \*

(4) The United States Department of Agriculture shall not disburse any of the information it receives from the [requested books and records and other] documents to any other government agency without a hearing before this Court and obtaining this Court's approval.

(5) The United States of America will be permitted to copy all documents furnished and will provide the debtor with a copy of the documents it copies.

(6) The parties reserve their rights in regard to their legal position concerning debtors' Motion to Quash the subpoenas in these matters.

13. During the summer of 1984, the corporate and individual debtors entered into negotiations to settle all claims filed in

---

fund. Funds deposited in custodial accounts are also trust funds.

(b) **Custodial accounts for shippers' proceeds.** Every market agency engaged in selling livestock on a commission or agency basis shall establish and maintain a separate bank account designated as "Custodial Account for Shippers' Proceeds," or some similar identifying designation, to disclose that the depositor is acting as a fiduciary and that the funds in the account are trust funds.

(c) **Deposits in custodial accounts.** The market agency shall deposit in its custodial account before the close of the next business day (the next day on which banks are customarily open for business whether or not the market agency does business on that day) after livestock is sold (1) the proceeds from the sale of livestock that have been collected, and (2) an amount equal to the proceeds receivable from the sale of livestock that are due from (i) the market agency, (ii) any owner, officer or employee of the market agency, and (iii) any buyer to whom the market agency has extended credit. The market

agency shall thereafter deposit in the custodial account all proceeds collected until the account has been reimbursed in full, and shall, before the close of the seventh day following the sale of livestock, deposit an amount equal to all the remaining proceeds receivable whether or not the proceeds have been collected by the market agency.

7. According to Mr. Bellew's testimony, which the Court credits, the discovered custodial shortages were not due to technical violations occurring due to bank error or a temporary insufficiency due to a check being returned for insufficient funds. Instead, the shortages amounted to serious violations which, if permitted to continue, could disrupt the marketing chain because customers would hesitate to take their livestock to a public auction fearing they might not get their money from any sales.

8. As a matter of fact, the debtors agreed to allow an inspection of all requested records except those records not subject to disclosure due to the attorney-client privilege.

their bankruptcy proceedings. The parties agreed that the settlements would be incorporated into the plans of reorganization.[9]

14. The Packers and Stockyards Administration, through Mr. Bellew, had knowledge of the negotiations but did not elect to enter into a settlement agreement with the debtors.

15. On August 7, 1984 the application of Randy Davis, d/b/a Cattleman's Commission Company, was accepted and registration granted by the Secretary, allowing the applicant to sell livestock on a commission basis. Notation on the acceptance letter stated that his registration is conditioned upon an investigative finding by the Packers and Stockyards Administration that Cattleman's Commission Company is not merely a successor to the business interest of Farmers & Ranchers set up to allow continuation of that entity's business.[10]

The Packers and Stockyards Administration is presently engaged in a continuing investigation into the operations and solvency of Randy Davis, d/b/a Cattleman's Commission Company.[11] Billy Gene Davis works as a "ringman" for Cattleman's Commission Company as he did for Farmers & Ranchers. His salary is $1,200.00 per month. Mary Davis is an office worker as she was for Farmers & Ranchers. Her salary is $150.00 per week.

16. On September 7, 1984 defendant United States of America, through the Administrator of the Packers and Stockyards Administration, filed a motion for modification of the Agreed Temporary Order, requesting that the following sentence be added to paragraph 4:

The release of information by written complaint filed before the Secretary of Agriculture and by submission of documents at any hearing(s) on said complaint shall not constitute a violation of this Order.

17. On September 14, 1984 debtors filed a response objecting to the proposed modification.

18. On October 19, 1984 the individual and corporate debtors filed amended complaints, adding numerous defendants,[12] including all secured creditors and requesting a hearing on the adversary proceedings and the motion for modification of the Agreed Temporary Order. The debtors also sought, among other things, to enjoin the United States of America and its agencies and representatives from filing the proposed administrative complaint with the Secretary against the debtors and Randy Davis, d/b/a Cattleman's Commission Company.

19. In late October, 1984, answers were filed as follows: On October 23, 1984 Randy Davis, d/b/a Cattleman's, filed an answer to the amended complaint and cross-claim against the United States of America, et al., seeking to enjoin the administrative proceedings; on October 25, 1984 the Bank of Cave City filed its answer to the Amended Complaint and its Cross-Claim against the United States of America, et al.; on October 25, 1984 First State Bank of Newport filed its Answer; also on October 25, 1984, C.C. Grace, d/b/a Grace & Grace Livestock Dealers, and Gordon Bray, d/b/a Bray Cattle Company, filed their separate responses and cross-complaints; and on October 26, 1984 the Unsecured Creditors' Committee filed its Answer.

9. On November 23, 1984 Plans of Reorganization were filed for the corporate and individual debtors.

10. The Court specifically credits the testimony of Mr. Bellew on this point.

11. Initially, Randy Davis refused to allow Mr. Bellew to examine the books and records of Cattleman's Commission Company. He has since complied with Mr. Bellew's request to review the documents.

12. The amended complaint added the following entities and individuals as defendants: White River Production Credit Association; Bank of Cave City, Arkansas; Citizens Bank of Batesville; First State Bank of Newport; Randy Davis, d/b/a Cattleman's Commission Company; Unsecured Creditors' Committee; C.C. Grace, d/b/a Grace & Grace Livestock Dealers; Rex White, d/b/a Rex White Livestock Auction; Justice Farms, Inc.; and Gordon Bray and John Bray, d/b/a Bray Cattle Company.

## SPECIFIC FINDINGS OF FACT

20. According to the record evidence, the investigation of Farmers & Ranchers and the Davises initiated in January of 1984 [13] includes the following:

(1) an examination of the "custodial" account of plaintiff Farmers & Ranchers in order to ascertain whether there were shortages in funds through misuse or misapplication thereof;[14]

(2) an examination of the books and records of Farmers & Ranchers in order to determine the financial condition of Farmers & Ranchers and Bill Davis;

(3) an examination of purchase invoices, sales invoices, cattle records and checks, and interviews of certain persons in order to determine the identities of holders of checks written on Farmers & Ranchers accounts and returned for insufficient funds; and

(4) an additional present investigation into the prior activities of the debtors not covered by the proposed administrative complaint.

21. According to the record evidence, the investigations of Randy Davis, d/b/a Cattleman's Commission Company, initiated in August of 1984 included the following:

(1) an examination of the "custodial" account of Cattleman's Commission Company in order to ascertain whether there were shortages in funds through misuse or misapplication thereof;

(2) an examination of the books and records of Cattleman's Commission Company in order to determine the financial condition of that business and of Randy Davis; and

(3) an inquiry into whether Randy Davis, d/b/a Cattleman's Commission Company,

is in fact a successor in interest to Farmers & Ranchers;

(4) an inquiry into whether Billy Gene Davis and Mary Lavone Davis, as employees of Randy Davis, d/b/a Cattleman's Commission Company, have been continuing to operate as market agencies and dealers;

(5) a determination of the extent, if any, that Billy Gene Davis and Mary Lavone Davis have exercised control and management of Cattleman's Commission Company; and

(6) an additional ongoing investigation into the activities of Randy Davis, d/b/a Cattleman's Commission Company, not covered by the proposed administrative complaint.

22. As a result of the investigation of the debtors, the Packers and Stockyards Administration has prepared an administrative complaint which could be filed against the debtors and Randy Davis, d/b/a Cattleman's Commission Company, if this Court determines said administrative proceedings are permitted under the section 362(b)(4) exception to the automatic stay.

## ADDITIONAL FINDINGS OF FACT

The Court makes the following additional findings:

23. Through negotiations begun in the summer of 1984, debtors have entered into settlement agreements with White River Production Credit Association, Bank of Cave City, First State Bank of Newport, and Citizens Bank of Batesville.

24. The settlement agreement with the Bank of Cave City provides for repayment of debts totalling $534,633.31 by the corporate and individual debtors; Randy Davis

---

**13.** The purposes of the investigative action were outlined in the subpoenas as follows:

Such requirements [for production and examination of the documents listed herein] are essential in connection with an investigation by the Secretary of Agriculture under the Packers and Stockyards Act, 1921, as amended, (7 U.S.C. § 181, *et seq.*) to ascertain whether the financial condition and livestock operations of Farmers & Ranchers Livestock Auction, Inc., Charlotte

and Mountain View, Arkansas, and Bill Davis, Batesville, Arkansas, are in conformity with the requirements of said Act, and whether funds thereof had been diverted....

**14.** The examination revealed that the general and custodial accounts of Farmers & Ranchers in the Bank of Cave City, Arkansas, had substantial shortages caused by overdrafts in the amount of $270,450.53.

and Danny Davis, sons of the individual debtors; and Jerry Millspaugh, an officer of the corporate debtor. The total debt to Bank of Cave City includes the debt for check overdrafts owed by the debtors in the sum of $270,450.53 and a $100,000 note on which Billy Gene Davis, Farmers & Ranchers, and Earl Patterson are named as debtors. Repayment is to be made from a percentage of the gross sales or collected earned commissions of Randy Davis, d/b/a Cattleman's Commission Company. Randy Davis, d/b/a Cattleman's Commission Company has nonrecourse limited liability under the settlement agreement only to the extent of his personal liability to the Bank of Cave City.

The record is devoid of any proof that non-debtor Randy Davis, d/b/a Cattleman's Commission Company, owes any outstanding debt to the debtors or that he is, for any other reason, legally obligated to make the payments to the Bank over and above his personal liability. His promise to pay the $100,000 note is secured by an assignment of and a security interest in his collected earned commissions and all personal property of Cattleman's Commission Company, a livestock auction barn.

25. The Court specifically credits the testimony of Fred McNew, president of White River Production Credit Association, and of James Street, executive vice president of the Bank of Cave City, Cave City, Arkansas, who testified that it is their opinion that Court approval of the settlement agreements and confirmation of the debtors' plans of reorganization would be in their best interests.

26. Proposed payments to be made by nondebtor Randy Davis, d/b/a Cattleman's Commission Company, under the agreements would be vital to the success of the settlement agreement and to the debtors' proposed Plans of Reorganization filed November 23, 1984.

27. The market agency and dealer licenses of Randy Davis, d/b/a Cattleman's Commission Company, are not property of the debtors' estate.

### JURISDICTIONAL STATEMENTS

The Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334 and under 11 U.S.C. §§ 105 and 362.[15] The Packers and Stockyards Administration, through the Secretary of Agriculture ("Secretary") has authority to regulate any dealers or market agencies pursuant to the Packers and Stockyards Act, 1921, as amended. See, e.g., 7 U.S.C. § 228(a).[16]

At the outset the Court notes that Randy Davis, d/b/a Cattleman's Commission Company, corporate debtor Farmers & Ranchers, and individual debtors Billy Gene Davis and Mary Lavone Davis, as market agencies and dealers, are subject to the requirements of the Packers and Stockyards Act and the regulations promulgated thereunder. See 7 U.S.C. §§ 201, 204, 213(b), and 222.[17] The Act provides for

---

**15.** Section 1334 of Title 28 as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA") gives federal district courts jurisdiction over bankruptcy cases and proceedings. Pursuant to Section 157 of title 28, created by BAFJA, the Bankruptcy Court may hear bankruptcy matters. Because this case was filed prior to the effective date for most of the BAFJA amendments to the Bankruptcy Code, all references in this opinion to statutes under the Bankruptcy Code are to statutes as they appear in the Bankruptcy Reform Act of 1978, as amended. See, P.L. 98–353, § 553(a).

**16.** The authority is set out in the Act as follows:
**§ 228. Authority of Secretary**
(a) The Secretary may make such rules, regulations, and orders as may be necessary to carry out the provisions of this chapter and may cooperate with any department or agency of government, any State, Territory, District, or possession or department, agency, or political subdivision thereof or any person;

\*     \*     \*     \*     \*     \*

**17.** See *supra* note 1 setting forth the Acts definitions of "market agency" and "dealer."

The Secretary is authorized to investigate possible violations of the Act by market agencies or dealers pursuant to 7 U.S.C. § 222 and to enter appropriate cease and desist orders pursuant to 7 U.S.C. § 213(b) as well as to suspend registrants pursuant to 7 U.S.C. § 204. Those provisions of the Act are as follows:
**§ 222. Federal Trade Commission Powers Adopted for Enforcement of Chapter.**

enforcement of its requirements by the Secretary through the initiation of investigations and administrative proceedings.[18]

## CONCLUSIONS OF LAW

### I.

The nature and scope of the Packers and Stockyards administration's continuing investigations and the proposed administrative proceedings fall within the exception to the automatic stay created by 11 U.S.C. § 362(b)(4).

The Court is convinced based upon the record evidence, that the nature and scope of the continuing investigations and the proposed administrative proceedings fall within the exception to the automatic stay created by 11 U.S.C. § 362(b)(4).

### Brief Outline of Statutory Scheme

Initially, in order to determine whether the activities of the Packers and Stockyards Administration are properly excepted from the automatic stay, it is necessary to examine the statutory scheme with regard to the stay. First, the Code sets forth in

> For the efficient execution of the provisions and in order to provide information for the use of Congress, the provisions (including penalties) of sections 46 and 48 to 50 of title 15, are made applicable to the jurisdiction, powers and duties of the Secretary in enforcing the provisions of this chapter and to any person subject to the provisions of this chapter, whether or not a corporation. The Secretary, in person or by such agents as he may designate, may prosecute any inquiry necessary to his duties under the chapter in any part of the United States.
> **§ 213. Prevention of unfair, discriminatory, or deceptive practices.**
> \*    \*    \*    \*    \*
> (b) Whenever a complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any stockyard owner or market agency is violating the provisions of subsection (a) of this section [which makes it unlawful for a market agency or dealer to engage in unfair practices], the Secretary after notice and full hearing may make an order that he shall cease and desist from continuing such violation to the extent that the Secretary finds that it does or will exist. The Secretary may also assess a civil penalty of not more than $10,000 for each such violation.
> \*    \*    \*    \*    \*    \*
> **§ 204. Bond and suspension of registrants.**

section 362(a)(1) the general rule establishing the stay of all actions against a bankruptcy debtor. The statutes then provide an exception to the automatic stay to allow a governmental unit to enforce its regulatory or police powers under section 362(b)(4). However, an examination of case law reveals that even a governmental unit will not be allowed to proceed against a debtor if the governmental activity is designed to protect a pecuniary interest of a particular creditor or has been initiated in bad faith. Finally, section 525 of the Bankruptcy Code prevents most governmental units from taking action against a bankruptcy debtor solely because of his status as such. That provision gives only three governmental agencies—including the Packers and Stockyards Administration— the latitude to revoke or suspend a debtor's license or other similar grant *solely* because the debtor has filed bankruptcy or has been insolvent.

A. Sections 362(a)(1) and 362(b)(4) of title 11.

Section 362(a)(1) provides:

> On and after July 12, 1943, the Secretary may require reasonable bonds from every market agency (as defined in this subchapter), every packer (as defined in subchapter II of this chapter) in connection with its livestock purchasing operation, except that those packers whose average annual purchases do not exceed $500,000 will be exempt from the provisions of this paragraph and any other person operating as a dealer (as defined in this subchapter) under such rules and regulations as he may prescribe, to secure the performance of their obligation, and whenever, after due notice and hearing, the Secretary finds any registrant is insolvent or has violated any provisions of this Chapter, he may issue an order suspending such registrant. Such order of suspension shall take effect within not less than 5 days, unless suspended or modified or set aside by the Secretary or a court of competent jurisdiction. If the Secretary finds any packer is insolvent, he may after notice and hearing issue an order under the provisions of § 193 of this title requiring such packer to cease and desist from purchasing livestock while insolvent, or while insolvent purchasing livestock except under such condition as the Secretary may prescribe to effectuate the purposes of this chapter.

**18.** See *supra* notes 16–17.

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title ... operates as a stay applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a ... administrative or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title. . . .

Ordinarily, the stay statute would protect the debtors in this case from the commencement of the administrative proceedings or the continuation of the investigations against them. However, the stay provision will not help the debtors here because in section 362(b)(4) the Code creates an exception to the automatic stay for the activities of the Packers and Stockyards Administration:

[§ 362] (b) The filing of a petition under §§ 301, 302 or 303 of this title ... does not operate as a stay—

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

The statute clearly states that the automatic stay does not apply to the continuation or commencement of an action or proceeding by a governmental unit if the action or proposed proceeding is to enforce the governmental unit's police or regulatory power.

■ The Court recognizes that, in spite of its express grant of authority to an agency to take action against a debtor, section 362(b)(4) is to be narrowly construed. Its legislative history makes this clear:

Section 362(b)(4) indicates that the stay under section 362(a)(1) does not operate to affect the commencement or continuation of an action or proceeding by a gov-

ernmental unit to enforce the governmental unit's police or regulatory power. This section is intended to be given a narrow construction in order to permit governmental units to protect the health and safety and not to apply to actions by a governmental unit to protect the pecuniary interest in property of the debtor or property of the estate.

124 Cong.Rec. H 11089, reprinted in 11C U.S. Code.Cong. & Admin.News 660–661 [Dec.1978] (Honorable Don Edwards, Chairman of the Subcommittee on Civil and Constitutional Rights of the House Committee of the Judiciary). Nevertheless, even given the need for narrow construction of the exception, the Court is convinced that all of the elements of section 362(b)(4) are present in this case and the exception is applicable. This situation involves the commencement and continuation for action and proceedings, i.e., the investigations are "actions" within the meaning of statute and the proposed administrative proceedings are, obviously, "proceedings." In addition, the Packers and Stockyards Administration is a "governmental unit" within the meaning of section 362(b)(4). See 11 U.S.C. § 101(21).[19]

Furthermore, based upon the record evidence the Court is convinced that the Packers and Stockyards Administration's continuing investigations and its plan to initiate administrative proceedings against the debtors are legitimate exercises of that agency's police or regulatory powers. The phrase "police or regulatory power" is not defined in the Bankruptcy Code. However, it is consistently interpreted to refer to the regulation of health, welfare, morals, and safety, rather than to the protection of the pecuniary interest of the debtors. *Accord: State of Mo. v. U.S. Bkrtcy Ct.*, 647 F.2d 768, 776 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982); and see, *In re Continental Airlines Corp.*, 40 B.R. 299, 303–305 (Bankr.S.

---

**19.** 11 U.S.C. § 101(21) is as follows:

(21) "governmental unit" means United States; ... department, agency or instrumentality of the United States, a State, a Common-

wealth, a District, a Territory, a Municipality, or a foreign State; or other foreign or domestic government;

D.Tex.1984) and *In re King Memorial Hospital, Inc.*, 4 B.R. 704, 707 (Bankr.S.D.Fla. 1980).

In order to determine whether the activities of the Packers and Stockyards Administration are proper exercises of "police or regulatory power" as outlined by case law, the Court must first examine the primary purpose of the Packers and Stockyards Act. Then, the Court must compare specific actions of the Packers and Stockyards Administration in this case with the statutes and regulations under the Packers and Stockyards Act in order to ascertain whether the administration has acted under proper authority. The Court may do this by first reviewing the scope of the Packers and Stockyards Administration's investigations of the debtors and then analyzing the nature of the administrative proceedings.

### 1. Primary Purpose of the Act

One of the primary purposes of the Act and its regulations is to protect the welfare of the public by assuring that the sellers and buyers who are customers of the auction market agencies and dealers are not victims of unfair trade practices. See, e.g., *Bruhn's Freezer Meats of Chicago, Inc. v. U.S. Dept. of Agriculture*, 438 F.2d 1332, 1337 (8th Cir.1971) (purpose of Act is to ensure fair trade practices in livestock marketing.) *U.S. Fidelity &*

*Guaranty Company v. Quinn Bros. of Jackson, Inc.*, 384 F.2d 241, 245 (5th Cir. 1967) (dicta: basic objective of Packers & Stockyards Act is to impose upon stockyards the nature of utilities, including the protection for the consuming public that inures in the nature of a public utility); and *United States v. Hulings*, 484 F.Supp. 562, 567 (Kan.1980) (creditors' failure to maintain bond violative of one purpose of Packers & Stockyards Act: to protect consumers from unfair practices).

### 2. The Investigation of the Debtors

In connection with the Secretary's responsibility to protect the public welfare, 7 U.S.C. § 222 and 9 C.F.R. § 201.3 authorize the Packers and Stockyards Administration to investigate possible violations of the Act by market agencies or dealers like the debtors.[20] Therefore, when the Georgia livestock seller complained that he had not received proceeds from the sale of livestock by the debtors, the Packers and Stockyards Administration had reasonable grounds to believe that a violation had occurred and that agency had no choice but to begin an investigation.[21] An investigation was particularly appropriate in this case where Billy Gene Davis had been found to have violated the Act in the past.

---

**20.** See *supra* note 16 for text of 7 U.S.C. § 222.

**§ 201.3 [7 C.F.R. § 201.3] Authority**

The Administrator shall perform such duties as the Secretary may require in enforcing the provisions of the Act and the regulations in this part.

**21.** The Act and its regulations provide that a market agency shall make prompt payment of any net proceeds from a sale.

**§ 228b. [7 U.S.C. § 228b.] Prompt payment for purchase of livestock**

(a) Each packer, market agency or dealer purchasing livestock shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price....

The relevant portions of 9 C.F.R. § 201.43 are as follows:

(a) Market agencies to make profit accounting and transmittal of net proceeds. Each market agency shall, before the close of the next

business day following the sale of any livestock consigned to it for sale, shall transmit or deliver to the consignor or shipper of the livestock, or the duly authorized agent, in the absence of any knowledge that any other person, or persons has any interest in the livestock, the net proceeds received from the sale and a written account of such sale, showing the number, weight and price of each kind of animal sold, the name of the purchaser, the date of sale, the commission, yardage and other lawful charges, and assess other facts as may be necessary to complete the account and show fully the true nature of the transaction.

\* \* \* \* \* \*

Also, 9 C.F.R. § 201.39 provides that payments for sales are to be made by the market agency only to the appropriate consignor or shipper unless there is a court order giving permission to do otherwise.

Furthermore, the subjects of the investigations in this case—the custodial accounts, books and records, and invoices— are entirely within the scope of a proper investigation to determine whether the debtors have complied with the law. For instance, 9 C.F.R. § 201.42 requires a market agency to maintain a custodial account, (a trust fund) and outlines procedures governing deposits, withdrawals and accounting methods in that connection.[22] In addition, 7 U.S.C. § 221 and 9 C.F.R. § 201.50 establish specific record-keeping requirements.[23] Other regulations require that agencies and dealers provide business information to the Secretary and allow the Secretary to inspect the business records upon request. 9 C.F.R. §§ 201.94, 201.95.[24]

Thus, a comparison of the record evidence with the applicable statutes and regulations of the Packers and Stockyards Act make it clear that, in investigating the debtor, the Administration has acted and continues to act within its authority.

### 3. The Proposed Administrative Proceedings

Mr. Bellew's testimony establishes that the investigations of the debtors have given the Packers and Stockyards Administration reasonable cause to suspect that the debtors have violated the Act. If these suspected violations are to be proved and sanctions imposed, if appropriate, the Packers and Stockyards Administration must be able to file administrative proceedings against the debtors.

The proposed sanctions[25] against the debtors include the suspension of the license of any registrant who is insolvent within the meaning of the Act [under 7 U.S.C. § 204 and 9 C.F.R. § 203.10][26] and the injunction of any registrant from operating under the Act. 7 U.S.C. § 228a.[27]

---

**22.** See *supra* note 6.

**23.** See *supra* note 4.

**24.** **§ 201.94 [9 C.F.R. § 201.94] Information as to business; furnishing of by packers, stockyard owners, market agencies and dealers.**

Each packer, stockyard owner, market agency and dealer shall give to the Secretary or his duly authorized representatives in writing or otherwise, and under oath or reaffirmation requested by such representatives, any information concerning the business of the packer, stockyard owner, market agency or dealer which may be required in order to carry out the provisions of the act and the regulations in this part in such reasonable time as may be specified in the request for such information.

**§ 201.95 [9 C.F.R. § 201.95] Inspection of records....**

Each packer, stockyard owner, market agency and dealer shall, upon proper request during ordinary business hours, permit authorized representatives of the Secretary to enter the place of business and examine records requested pertaining to the business of the packer, stockyard owner, market agency or dealer, as such and to make copies thereof, and effect such property of person subject to the act as is necessary to carry out the provisions of the act and the regulations in this part. Any necessary facility for such examination of records and inspection of property shall be extended to authorized representatives of the Secretary by the packer, stockyard owner, market agency or dealer, his agents and employees.

**25.** See *supra* note 17 for text of 7 U.S.C. § 213(b).

**26.** See *supra* note 17 for text of 7 U.S.C. § 204. **§ 203.10 [9 C.F.R. § 203.10] Statement with respect to insolvency; definition of current assets and current liabilities.**

A statement with respect to insolvency and a definition of current assets and current liabilities as follows:

(a) Under the Packers and Stockyards Act, 1921, as amended, and supplemented (7 U.S.C. section 181, *et seq.*) the principal test of insolvency is to determine whether a person's current liabilities exceed his assets. This current ratio test of insolvency under the act has been reviewed and affirmed by the United States Department of Agriculture, *Bowman v. U.S. Dept. of Agriculture,* 363 F.2d 81 (5th Cir.1966).

The remainder of that regulation defines current assets and liabilities and points out that a need to examine a market agent's or dealer's custodial account would be necessary to determine the question of insolvency. For example that regulation provides that current liabilities include bank overdrafts, amounts due a custodial account for shippers proceeds, and other obligations whose liquidation is reasonably expected to require the use of existing resources classified as current assets. 9 C.F.R. § 203.10(b)(c).

**27.** **§ 228a [7 U.S.C. § 228a] Authority of Secretary....**

Whenever the Secretary has reason to believe that any person subject to this chapter ... (b) has operated while insolvent or otherwise in

Accordingly, the record evidence demonstrates that the investigations of the debtors and the proposed proceedings involved here primarily concern regulations for the public welfare through the Packers and Stockyards Administration's careful monitoring of the debtors' handling of customer funds and other business conduct in order to determine the debtors' continued fitness to serve as market agencies and dealers.

### A. Pecuniary Interest

The debtors have alleged that the investigations and contemplated administrative proceedings are designed to protect the pecuniary interests of Earl Patterson and First National Bank in Batesville, a creditor bank. However, they presented inconsequential and insufficient proof on this issue, and the Court must reject the debtor's allegation as being wholly without merit.

### B. Bad Faith

■ The debtors also allege that the Packers and Stockyards Administration has initiated investigations and plans to file proceedings against them in bad faith and, as such, should be enjoined. It is true that this Court could enjoin an administrative action or proceeding, ostensibly excepted from the automatic stay, upon a demonstration that the action or proceeding has been initiated in bad faith, *Matter of National Hospitals and Institutional Builders Co.*, 658 F.2d 39, 43–44 (2nd Cir.1981); see also, *In re Lawson Burich Associates, Inc.*, 31 B.R. 604, 610–611 (Bankr.S.D.N.Y. 1983) (injunctive relief denied). In order to establish bad faith, the debtors had to show that the Packers and Stockyards Administration: (1) seeks to enforce a flagrantly unconstitutional law; (2) proposes to sue

them in a prejudiced forum; (3) is acting in willful disregard of the law; or (4) is seeking to harrass them. *Matter of National Hospitals and Institutional Builders Co.*, 658 F.2d at 44.

■ In this case the debtors assert bad faith by alleging that (1) the government failed to inform them promptly of Mr. Bellew's recommendations that administrative proceedings to suspend their licenses be initiated; and (2) the Packers and Stockyards Administration has not chosen to investigate or file administrative proceedings against Earl Patterson, despite his close ties to the debtors as corporate officer in 1976 and as lessor of the auction market facilities.

On the first point, the debtors have not established that there is a duty under the Packers and Stockyards Act which would require the Packers and Stockyards Administration to inform the debtors of Mr. Bellew's recommendations. The Court can find no bad faith on the part of the agency in its delay in informing the debtors of their plan to file administrative proceedings. Certainly, Mr. Bellew's letter to his supervisor on April 2, 1984 outlining his recommendations to initiate proceedings to suspend the licenses of the debtor is no proof that a final decision to follow those recommendations had been reached. Indeed, Mr. Bellew was not vested with the authority to make the final decision. Regardless, it appears that the debtors must share some responsibility for the delay in the agency's reaching its final decision because of their failure to voluntarily disclose their records to the agency as required under the Packers and Stockyards Act.

On the second point, the Court finds that the record evidence simply does not support the allegation that the failure of the

---

violation of this chapter in a manner which may reasonably be expected to cause irreparable damage to another person; or (c) does not have the required bond; and that it would be in the public interest to enjoin such person from operating subject to this chapter or enjoining him from operating subject to this chapter except under conditions as would protect vendors or consignors of such commodities or other persons until a complaint under this chapter is

issued and dismissed by the Secretary or an order to cease and desist made thereon by the Secretary has become final and effective within the meaning of this chapter or as set aside on appellate review of this Secretary's order, the Secretary may notify the Attorney General, who may apply to the United States which person has his principal place of business or in which he resides for a temporary injunction or restraining order.

Packers and Stockyards Administration to investigate Earl· Patterson demonstrates that agency's bad faith. The mere fact that he was an officer of the debtor corporation in 1979 does not establish that the agency acted in bad faith when it began its investigations of the debtors but did not conduct an inquiry into the affairs of Mr. Patterson.

Indeed, the agency never received a complaint about Mr. Patterson's conduct from any customer of Farmers & Ranchers. In addition, the Court is convinced based on the record evidence that the Davises alone operated Farmers & Ranchers on a daily basis. There is not a scintilla of evidence that Mr. Patterson was involved in the daily operation or management of Farmers & Ranchers.

In summary, the record evidence does not reveal proof of the existence of any of the factors necessary to prove bad faith, and, therefore, the Court will not enjoin the Packers and Stockyards Administration on the basis of a bad faith theory.

■ The Court is convinced based on the record evidence that the investigations of the debtors in this case are proper actions and fall within the meaning of the section 362(b)(4) exception to the automatic stay.

## II.

The Bankruptcy Court should not enjoin the Packers and Stockyards Administration from initiating the proposed administrative proceedings against the debtors and Randy Davis, d/b/a Cattleman's Commission Company, even though the proceedings threaten to defeat the settlement agreements essential to the debtors' reorganization.

*Injunctive Relief as to the Debtors*

In addition to an injunction based on bad faith, the debtors are asking, pursuant to section 105(a), for an injunction under that provision to prohibit the Packers and Stockyards Administration from filing a proposed administrative complaint before the Secretary of Agriculture, seeking to suspend the debtors' licenses under the Packers and Stockyards Act.

■ Section 105(a) of the Bankruptcy Code provides:

"(a) The bankruptcy court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." The fact that the activities of the Packers and Stockyards Administration fall within the section 362(b)(4) exception does not mean their activities could not be enjoined under section 105 on some appropriate basis. See, *Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 273–74 (3rd Cir. 1984); *State of Mo.*, 647 F.2d 768, 776 & n. 14; *In re Thomassen*, 15 B.R. 907, 910 (Bankr.App.Panel 9th Cir.1981); *In re Sewanee Land, Coal and Cattle, Inc.*, 34 B.R. 696, 701 (Dist.Ct.N.D.Ala.1983); *In re Compton Corp.*, 40 B.R. 880, 882 (Bankr. N.D.Tex.1984); *In re Rath Packing Co.*, 38 B.R. 552, 561–62 (Bankr.N.D.Iowa 1984); *In re Golden Plan of California, Inc.*, 37 B.R. 167, 170–71 (Bankr.E.D.Cal.1984); *Matter of Kennise Diversified Corp.*, 34 B.R. 237, 242 & n. 4 (Bankr.S.D.N.Y.1983); *In re GHR Energy Corp.*, 33 B.R. 449, 450–51 (Bankr.D.Mass.1983); *In re County Fuel Co., Inc.*, 29 B.R. 534, 536–37 (Bankr. D.Md.1983); *In re Pizza of Hawaii*, 12 B.R. 796, 799 (Bankr.HI 1981); *In re Northern Boneless Meat Corp.*, 9 B.R. 27, 29 (Bankr.S.D.N.Y.1981) (interpreting § 2(a)(15) of the Bankruptcy Act, predecessor to § 105(a)); *In re King Memorial Hospital, Inc.*, 4 B.R. 704, 709 (Bankr.S.D. Fla.1980).

■ The debtors have shown that an order enjoining the proposed administrative proceedings is critical to the success of their settlement agreement and proposed plan of reorganization. However, the Court has determined that the debtors are not entitled to injunctive relief under section 105 of the Bankruptcy Code because the investigation conducted by the representative of the Packers and Stockyards Administration have been within their statutory duties and the decision as to whether the debtor's licenses should be revoked

should be determined before the appropriate administrative agency (as here an administrative hearing before the Packers and Stockyards Administration) and not by the Bankruptcy Court.

Furthermore, Congress, by specifically enacting section 525 [28] of title 11 of the Bankruptcy Code, limited this Court's jurisdiction under section 105 in regard to enjoining the Packers and Stockyards Administration from initiating administrative proceedings which could lead to suspension of the licenses as the result of investigations of insolvency of debtors in Chapter 11 proceedings.

The unequivocal language of section 525 of the Bankruptcy Code gives the Packers and Stockyards Administration the authority to revoke, suspend or refuse to renew a license solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.[29]

The express authority in section 525 of the Bankruptcy Code which allows the Packers and Stockyards Administration to proceed against the debtors is an exception created by Congress to the "fresh start" concept basic to most bankruptcy laws which generally prevent discrimination against a debtor solely because of his insolvent or bankrupt status.

The legislative history clearly reveals that Congress made a public policy choice that the rehabilitative objectives of the Bankruptcy Code were not to interfere with the ability of the Secretary of Agriculture (and the Packers and Stockyards Administration acting pursuant to statutory authority from the Secretary of Agriculture) to administer the Packers and Stockyards Act.[30]

**28.** Section 525 of the Bankruptcy Code reads as follows:

**Protection against discriminatory treatment.** Except as provided in Perishable Agricultural Commodities Act, 1930 (7 U.S.C. §§ 499a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. §§ 181, 229), and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C. § 204), a governmental unit may not deny, revoke, suspend or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debt under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

**29.** *Id.*

**30.** The Bankruptcy Reform Act of 1978 evolved in part from HR 8200, a bill introduced in the House of Representatives on July 11, 1977. Section 525 appeared in HR 8200 with no exception to its prohibition against discriminatory actions by governmental units. H.R. 8200, Union Calendar No. 311, p. 409, reprinted in Collier, App. Vol. 3. The House Judiciary Committee reported the bill without amending § 525.

On October 28, 1977, during the House debates on HR 8200, the Honorable Thomas S. Foley, Chairman of the House Committee on Agriculture, offered an amendment creating the exceptions to § 525 that were eventually enacted as part of the Bankruptcy Reform Act of 1978.

Mr. Foley. Mr. Chairman, section 525 of proposed new title II of the United States Code dealing with bankruptcy forbids any governmental unit at any level from denying a license to, discriminate against, or denying employment to a person solely because he has been a bankrupt, or has been insolvent, or has failed to pay a debt that is dischargeable in a case under title II. The Agriculture Committee has no quarrel with the basic philosophy underlying this provision which is to prevent discrimination against a person solely—and I emphasize the word "solely"—because that person has undergone bankruptcy. However, I am concerned that, without clarification, the section might be interpreted in such a way as to prevent the Secretary of Agriculture from

Section 105 of the Bankruptcy Code is the provision through which the Court may generally enforce its orders under title 11. The power to enjoin under section 105(a) is not unlimited, however. *Johnson v. First National Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir.1983); *Sewanee Land, Coal and Cattle*, 34 B.R. at 701; *In re Johns-Manville Corp.*, 26 B.R. 405, 415 (Bankr.S.D.N.Y.1983); Collier, Para. 105.02, p. 105–107. The injunctive power must be.

used in a manner which is consistent with the Bankruptcy Code. *Johnson*, 719 F.2d at 273. Here, an injunction in favor of the debtors under section 105 of the Bankruptcy Code against the Packers and Stockyards Administration would be inconsistent with section 525 of the Bankruptcy Code and would frustrate the mandated congressional intent that the Secretary should have unrestricted power to regulate market agencies and dealers,[31] particularly where

carrying out his statutory responsibilities under the Perishable Agricultural Commodities Act, the Packers and Stockyards Act, and the supplementary packers and stockyards legislation contained in the Act of July 12, 1943, 7 U.S.C. 204. This amendment is simply designed to clarify the fact that section 525 does not in any way interfere with administration by the Secretary of Agriculture of these statutes.

Under the Packers and Stockyards Act and the act of July 12, 1943, persons purchasing livestock in commerce are required to conduct their businesses in a financially responsible manner, and market agencies and dealers must be licenses of market agencies and dealers are required to have a bond and to pay for all livestock purchased. The licenses of market agencies and leaders may be suspended if they become insolvent. Packers may be ordered to cease and desist from failing to pay for livestock and packers who become insolvent may be ordered to cease and desist from operating except under such conditions as the Secretary may impose.

\*     \*     \*     \*     \*     \*

The Committee on Agriculture has no quarrel with the "fresh-start" philosophy underlying this bill. However, that philosophy is not new and has heretofore been one of the principal purposes of the bankruptcy laws. Because of the peculiar vulnerability of producers of perishable agricultural commodities and livestock, Congress has seen fit, notwithstanding this philosophy, to enact and from time to time amend the Perishable Agricultural Commodities Act, the Packers and Stockyards Act, and the Act of July 12, 1943.

The Committee on Agriculture conducted oversight hearings on the PACA program twice in the 94th Congress and found that the program is generally operating well and is serving its purpose in protecting the producers of perishable agricultural commodities and the public. Last year, after extensive hearings, Congress enacted Public Law 94–410 which made extensive amendments to the Packers and Stockyards Act and the act of July 12, 1943, to assist the Secretary to prevent recurrence of the catastrophic losses to livestock producers which attended the bank-

ruptcies of several large packers in the past few years. Both of these programs must be continued if this Nation is to continue to have a ready source of nutritious food at prices which are reasonable to both the producer and the consumer.

\*     \*     \*     \*     \*     \*

[Honorable M. Caldwell Butler, member of the Judiciary Committee and co-sponsor of HR 8200—]

Mr. Chairman, I would like to note that section 525 of the new Bankruptcy Code by its very terms applies only in situations in which governmental units, either in hiring or in administering licensing programs, discriminate solely on the basis of whether a person is, or has been, a bankrupt. The gentlemen from Washington (Mr. Foley) correctly points out that the section applies only where the discrimination is practiced "solely" on that basis.

I am told that lawyers at the Agriculture Committee and in the General Counsel's Office at the Department of Agriculture are nevertheless of the opinion that without clarification, section 525 might be interpreted to prevent the Secretary from taking necessary regulatory actions under the Perishable Agricultural Commodities Act, the Packers and Stockyards Act, and the act of July 12, 1943, 7 U.S.C. 204. It is difficult for me to understand this interpretation. As noted in our report, it was never the intention of the Judiciary Committee to interfere with legitimate regulatory objectives. However, if section 525 is susceptible to such interpretations, I am glad of this clarification.

123 Cong.Rec. H 11761, H 11762 and 11763 (October 28, 1977).

**31.** See *supra* note 1.

**§ 201.11 [9 C.F.R. § 201.11] Officers, agents and employees of registrants whose registrations have been suspended or revoked.**

(a) Any person who has been or is an officer, agent or employee of a registrant whose registration has been suspended or revoked and who was responsible for or participated in the violation on which the order of suspension or revocation was based may not register within the period during which the order of suspension or revocation is in effect.

the pecuniary interest of the debtor's insolvency and management of the custodial account are at issue.[32]

### Injunctive Relief as to Randy Davis d/b/a Cattleman's Commission Company

The debtors are also seeking injunctive relief for Randy Davis, d/b/a Cattleman's Commission Company, a non-debtor in these Chapter 11 proceedings. In doing so, they ask this Court to enjoin the Packers and Stockyards Administration from continuing its investigation into the business affairs of the non-debtor and from initiating administrative proceedings to suspend or revoke his licenses as market agency and dealer.

■ First, this Court, after considering the record evidence in these proceedings, is convinced that the nature and scope of the investigation conducted by the representatives of the Packers and Stockyard Administration of Randy Davis, d/b/a Cattleman's Commission Company, is proper and comes within its police or regulatory power under section 362(b)(4) of the Bankruptcy Code.

The subject matter of the Packers and Stockyards Administration's investigation of Randy Davis, d/b/a Cattleman's Commission Company, reveals that it is to determine whether Randy Davis, d/b/a Cattleman's Commission Company, is in fact a successor in interest to the debtor Farmers & Ranchers, Inc.; the source of funds of Randy Davis, d/b/a Cattleman's Commission Company, to start his business; the solvency or insolvency of Randy Davis, d/b/a Cattleman's Commission Company; and the managerial or non-managerial role of the individual debtors in their employment by their son with his business; and the status of the custodial account of Randy Davis, d/b/a Cattleman's Commission Company.

■ This Court, after careful review of section 362(b)(4), section 525 and section 105 of the Bankruptcy Code, has determined that it cannot enjoin similar activities of the Packers and Stockyards Administration against Randy Davis, d/b/a Cattleman's Commission Company. This Court's injunctive powers under section 105 of the Bankruptcy Code have been specifically limited by Congressional enactment of section 362(b)(4) and section 525 under the facts of these proceedings. If the bankruptcy laws will not protect the debtors who have sought relief by filing bankruptcy petitions, those same laws cannot and should not protect a non-debtor, whose licenses are not assets of the debtors' estate.

■ Further, this Court is persuaded that it does not have subject matter juris-

**§ 201.12 Registrants whose registrations have been suspended or revoked.**

(a) Any person whose registration has been suspended or revoked may not again register in his own name or in any other manner within the period during which the order of suspension or revocation is in effect, and no partnership, firm or corporation in which any such person has a substantial financial interest will be registered during such period.

**§ 201.81 Suspended registrants**

No stockyard owner, packer, market agency, or dealer shall employ any person who has been suspended as a registrant to perform activities in connection with livestock transactions in commerce during the period of such suspension: Provided, that the provisions of this section shall not be construed to prohibit the employment of any person who has been suspended as a registrant until such time as the person demonstrates solvency or obtains the bond required under the Act and regulations. No such person shall be employed, however, until after the expiration of any specified period of suspension contained in the order of suspension.

**32.** The Sixth Circuit has recently held that section 525 authorizes the Secretary to continue to exercise his license-revocation authority under the Perishable Agricultural Commodities Act against a bankruptcy debtor. *Melvin Beene Produce Co. v. Agricultural Marketing Service,* 728 F.2d 347, 351 (6th Cir.1984). There is no reason why the result should be any different in this case, where the debtors are subject to regulation under the Packers and Stockyards Act. Section 525 subordinates the "fresh start" or rehabilitative policies of the Bankruptcy Code to the Secretary's regulatory powers under the Packers and Stockyards Act.

diction over Randy Davis' "licenses." The licenses are the property right of a non-debtor.[33] The debtors do not have a property right in the licenses of the non-debtor Randy Davis, d/b/a Cattleman's Commission Company, under section 541 of the Bankruptcy Code. That provision reads:

### § 541. Property of the estate

(a) The commencement of a case under section 301, 302 or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

The debtors have admitted that they do not have any ownership interest in or managerial control of the non-debtor's business. At best it could be said that the debtors would have only a "beneficial interest" in the licenses of the non-debtor Randy Davis under their plan of reorganization.

The Court recognizes that there is a line of cases where Courts have extended their injunctive powers under section 105 of the Bankruptcy Code in Chapter 11 reorganization cases to protect a co-debtor or guarantor who has not sought protection of a bankruptcy court by filing petitions under the bankruptcy laws. See, e.g., *In re Otero Mills, Inc.*, 25 B.R. 1018 (Dist.Ct.D.N.M. 1982) and *First Federal S. & L. Ass'n v. Pettit*, 12 B.R. 147 (Dist.Ct.E.D.Ark. 1981).[34] However, in each case the injunc-

---

**33.** Only the Packers and Stockyards Administration has authority to grant, suspend, or revoke a license to operate an auction barn. The regulatory scheme under the Packers and Stockyards Act reveals that *each* person must apply for his own license. Accordingly, a license is not transferable or assignable. See 9 C.F.R. § 201.10 which reads in part:

**§ 201.10 Requirements and procedures.**

(a) Every person operating or desiring to operate as a market agency or dealer ... shall apply for registration under the Act....

**34.** In *Otero Mills*, the corporate debtor had executed promissory notes providing for repayment of two bank loans in installments. The president of the corporation had signed the notes as guarantor. Later, the corporation filed a bankruptcy petition and then stopped making installment payments to the bank. The bank sued the president of the corporation, in his individual capacity, in state court. Then the bankruptcy court in which the corporate debtor had filed its petition issued a preliminary injunction against the bank, prohibiting the bank from enforcing the state court judgment against the non-debtor president of the corporation.

The bankruptcy court's Order issuing a preliminary injunction was appealed to the district court. In reviewing the order, the district court framed the relevant legal issue as follows:

Whether a bankruptcy court has power under 11 U.S.C.A. § 105(a) (1979) to enjoin parties from proceeding in state court against third parties where the bankruptcy court finds that failure to enjoin would affect the bankruptcy estate and would adversely or detrimentally influence and pressure the debtors through third parties?

The district court then noted that the bank's lawsuit against the debtor's president was related to the bankruptcy proceedings in that the president was an officer and shareholder of the debtor and that the debtor's plan of reorganization would require a contribution of assets by the president to the debtor. The district court concluded that these facts were sufficient to give the bankruptcy court jurisdiction to determine whether to issue an injunction. 25 B.R. at 1020–1021.

In *Pettit, supra,* the debtors, husband and wife, were borrowers with the wife's parents under a mortgage and promissory note securing a personal residence. The debtors' plan of reorganization provided for an extension of time in making installment payments and a deferred payment of all delinquent installments until the end of the note.

The mortgagee bank petitioned the bankruptcy court for leave to sue the non-debtor mortgagors. The bankruptcy court denied this request based upon § 105(a). On appeal, the district court ruled that the bankruptcy court had jurisdiction over the non-debtors because the planned action against them was "sufficiently connected to the bankruptcy proceeding." Then the district court concluded that an action against the debtors' relatives would interfere with the debtors proposed reorganization. The Court made the following observations:

While the jurisdiction of the Court to enjoin an action against a co-debtor must be determined on a case-by-case basis, where, as here, the action to be enjoined is against a close relative and involves a personal residence, it can be seen that such an action might place pressure upon the bankrupt and ultimately affect the proposed reorganization.

12 B.R. at 148–149.

tion either prevented interference with an asset of the debtor's estate or prevented action against a guarantor who had shared liabilities with the bankruptcy debtor. In these proceedings the assets which the debtors are seeking to protect (licenses of a non-debtor) are not property of the debtors' estate which the injunctive power of this Court can reach under section 105 of the Bankruptcy Code. Furthermore, in this case non-debtor Randy Davis was neither a co-debtor nor a guarantor of the debtors' financial obligations as was the case in *Pettit* and *Otero Mills*. In the settlement agreements Randy Davis guaranteed only the amount of his personal indebtedness to the Bank of Cave City. The debtors have no claim against Randy Davis nor does Randy Davis have any claim against the estates of the debtors.

█ This Court is painfully aware that, if the defendants are not enjoined from further administrative proceedings which could lead to suspension or revocation of the licenses of the debtors and non-debtors, the debtors' Chapter 11 reorganization plans in all likelihood will fail. However, this Court will not substitute its judgment for that of Congress. Congress has mandated that "national public policy" prevails over "local interests" under the facts of these proceedings by specifically enacting sections 362(b)(4) and section 525 of the Bankruptcy Code, thereby restricting this Court's jurisdictional grant under section 105 of the Bankruptcy Code. A bankruptcy court should avoid issuing an injunction when the effect of the injunction would be to circumvent congressional policies embod-

*Otero Mills* and *Pettit* stand for the proposition that a bankruptcy court may assume jurisdiction to enjoin an action against a nondebtor if the action threatens (1) an asset of the bankruptcy estate; (2) the success of a plan of reorganization; or (3) undue influence or pressure upon the debtor. The decision in *Otero Mills* turned largely on the fact that the debtors' plan of reorganization required the non-debtor officer to contribute assets. The Court in *Pettit* attached significance to the fact that an action against close relatives might pressure the debtors. A common factor in both cases is that the bankruptcy debtors shared assets or liabilities with non-debtors.

ied in regulatory statutes. See, e.g., *Sewanee Land, Coal and Cattle*, 34 B.R. at 702.

## CONCLUSION

To enjoin the Packers and Stockyards Administration from proceeding with its statutory duties under 7 U.S.C. § 181, *et seq.* and section 362(b)(4) and section 525 of the Bankruptcy Code would be contrary to the mandate of the policy set by Congress.

## RELIEF TO BE ORDERED

The continuing investigations and proposed administrative proceedings against the debtors and Randy Davis, d/b/a Cattleman's Commission Company, are excepted from the automatic stay by section 362(b)(4). The debtors and Randy Davis, d/b/a Cattleman's Commission Company have failed to show that they are entitled to an injunction against these activities or that the Court has jurisdiction to grant such relief.

Therefore, the adversary complaints requesting injunctive relief will be denied and dismissed. The Packers and Stockyards Administration may continue their investigations and file administrative proceedings against the debtors and Randy Davis, d/b/a Cattleman's Commission Company. The Secretary may enter a decision on whether their licenses should be suspended and may assess any fine that it deems appropriate.

The Court will preserve the Protective Order entered during trial of these adversary proceedings on October 25, 1984.[35]

**35.** At the October 26, 1984 trial of these adversary proceedings, the Court admonished the parties that none of them may use the trial transcript in any administrative proceeding before the Secretary. The Court entered a protective Order to that effect on the same day. This protective Order will remain in effect despite the dismissal of the debtors' adversary complaints.